**MAPCO, INC., et al., Appellants,**

v.

**Clarence CARTER, et al., Appellees.**

**No. 09–88–198 CV.**

Court of Appeals of Texas,
Beaumont.

April 22, 1991.

Dissenting Opinion April 25, 1991.[1]

Rehearing Denied May 9, 1991.

---

1. This dissent was not filed on Monday, April 22, 1991, with the majority opinion because I found no compelling reason to deviate from the court's usual custom of delivering civil opinions on Thursdays.

Ben Taylor, Lee A. Hunnell, Roger Townsend, Fulbright & Jaworski, Houston, Tex., J.C. Zbranek, Zbranek & Hight, P.C., Liberty, Tex., Royce M. Parr, General Counsel, Mid–America Pipeline Co., Tulsa, Okl., for appellants.

Tom F. Coleman, Jr., Thomas Lee Bartlett, Coleman, Bartlett & Associates, Houston, Tex., for appellees.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

BROOKSHIRE, Justice.

## OPINION ON REMAND

Appeal from a judgment ordering partition and making an award of owelty in the partition of a fee mineral estate.

### Partial Background History

Clarence Carter, James Ross Carter and Clyde Carter brought a cause of action against Mapco Underground Storage of Texas, Inc. ("M.U.S.T.") and Texasgulf, a private corporation, for the equitable proceeding of partitioning of the fee mineral estate owned and possessed, in undivided interests, by the litigants. The Plaintiffs' pleadings contained a count for waste caused by a leaching operation. M.U.S.T. and Mapco, Inc., had created a cave or cavern within a salt dome formation. This salt dome formation comprised the litigated fee mineral estate. The reason and purposes for the cavern were for storing natural gas, petroleum and other hydrocarbons. A motion was filed to sever the damage claims from the equitable proceeding in partition. A request for an accounting of the salt that had been removed was pleaded.

The position of M.U.S.T. was that the Carters and the Carter interests were subject to estoppel from asserting the equitable partition proceeding because of prior litigation. M.U.S.T. maintained that the prior litigation had been filed by certain trustees of a lessee of the Carters' mineral interest. The prior suit ended in a judgment. The present suit resulted in a judgment. M.U.S.T. contended that the *first* judgment settled all the rights of the parties involved in the present litigation. In the interim, Texasgulf had sold its mineral interest to what was known as the Turkey Creek Mineral Trust. Texasgulf was no longer an active litigant.

At this point, M.U.S.T. filed a cross-action for a partition of the entirety of the mineral estate. The Turkey Creek Mineral Trust and the Carters petitioned for equitable owelty. Then M.U.S.T. pleaded that the cavern or cave be set aside to its interest, averring that said cavern was an improvement constructed and leached out at the cost of M.U.S.T. By a further pleading, the Carters and Turkey Creek alleged that M.U.S.T. and its interest and the interest it represented, removed a part of the fee mineral estate in bad faith and as trespassers. The Carters asked for an accounting and for owelty by reason of the disproportionate and inequitable evaluations of the cavern in relationship to the balance of the fee mineral estate.

At a bench trial, held in January, 1988, it was demonstrated that M.U.S.T. had conveyed all of its interest in the surface as well as the mineral estate pendente lite to one Gordon Speer. Speer was a witness and testified at trial. Later, Landmark Minerals Trust purchased the interest of Turkey Creek.

The equity court's decree found that Gordon Speer was the owner of the surface estate and further found that Speer owned a 1/8th interest in the mineral estate. The court found that Landmark Trust, as the successor to the entirety of the interest of Turkey Creek, owned a 2/8th interest in the mineral estate. Hence, neither Turkey Creek nor Landmark Trust owned or leased all of the Carters' interest in the mineral estate. In actuality, the decree pronounced that James Ross Carter, Mrs. Clyde Carter and Clarence Carter owned a separate and distinct 5/8ths interest in a 42–acre tract,

being a part of a 126–acre fee mineral estate. The court, sitting in equity, further found that the fee mineral estate or property was properly subject to, and susceptible to, a partition in kind. The chancellor ordered a partition of the fee mineral estate, awarding a certain 15.797–acre tract surrounding and including the cavern, itself, to be set aside to Gordon Speer, who had paid one million dollars to the grantor for Speer's interest. The chancellor also ordered an in personam owelty award and judgment in the amount of $450,000 against and adverse to M.U.S.T. and Mapco, Inc. Mapco, Inc., owned M.U.S.T. Mapco, Inc., was the parent governing company. The equity decree also established a lien against the property set aside to Speer to assure the payment of the owelty award. The chancellor denied other requested, various reliefs. The decree below also ordered Mapco, Inc., to pay the court costs, including the fees and costs of the Commissioners to bring about the equitable partition between, and among, the fee mineral estate owners. Both M.U.S.T. and Mapco, Inc., perfected this appeal.

At a prior date, in 1989, our Ninth Court of Appeals affirmed in part and reversed and remanded in part this cause of action as reported at 786 S.W.2d 368 (Tex.App.—Beaumont 1989), including a dissent at 373 to which reference is here made. Our Supreme Court reversed and remanded this cause back to the Ninth Court of Appeals in an unpublished opinion. It should be stressed that, in the very first litigation, the equitable remedy of partition was not before the trial court. The important, if not the paramount, issue of equitable owelty was not before the trial court in any previous litigation. The prior litigation was in the nature of a declaratory judgment proceeding.

The Appellants here, seeking to prevail by the doctrine of collateral estoppel, must fail. This, we think, is clearly shown by the record—that the facts and factual settings and the vital issues and doctrines, sought to be litigated in this second case, were simply not presented and litigated in the previous declaratory judgment action. Secondly, the facts in the instant appeal were not essential to the judgment in the previous declaratory judgment suit. The equitable doctrine of partition and the equitable concepts of owelty were not presented. Furthermore, the first set of parties were different and certain other parties embraced different positions in the latter suit.

We think it is conceded by the parties on appeal that partition was not decided in the first suit. Further, we think it is clear that our present Appellants did not object that the prior judgment in the first suit did not deal with, or adjudicate, either partition or owelty. *Well settled is the rule that the litigant seeking to invoke collateral estoppel definitely has the burden of establishing that doctrine.* Appellants did not discharge their burden. M.U.S.T. obtained a judgment against Turkey Creek but Turkey Creek did not own or possess all of the fee mineral estate. The Carters owned and possessed a majority portion of the fee mineral estate. We think it is clear that the Carters were simply not parties to the first suit and, indeed, Turkey Creek was not demonstrated to be the representative of the Carters. Turkey Creek had only a small interest. We fail to find in the record a power of attorney enabling Turkey Creek to bring the first suit in such a manner as to represent or bind the Carters. Turkey Creek's interest, or the majority interest of the Carters, are certainly not identical, certainly not in quantity or quality. Under any reasonable interpretation of the record, the Carters always owned definite, important and certain royalty interests.

Our Ninth Court of Appeals, in the previous, original opinion, held that the trial court did not err in failing to find that the Carters were collaterally estopped. See and compare the previous opinion at 786 S.W.2d at 371. We conclude that the holding in *City of Bridge City v. City of Port Arthur,* 792 S.W.2d 217 (Tex.App.—Beaumont 1990, *writ denied*) is meaningfully different on the facts and not controlling of this appeal on the issue of collateral estoppel.

In a bench trial sitting in equity for partition, an owelty award of $450,000 was rendered *in personam* adverse to Mapco, Inc. The owelty award resulted from a suit for equitable partition of a mineral estate. The surface estate was not involved. The trial chancellor filed original Findings of Fact and amended and supplemental Findings of Fact but declined to make certain additional Findings of Fact as requested by the Appellants. See the first dissent herein at 786 S.W.2d at 373.

In March of 1988, the District Court signed a modified decree ordering partition and appointing commissioners. The plaintiffs, Clarence Carter, James Ross Carter and Clyde Carter, were awarded an in personam money owelty judgment against Mapco, Inc., in the above amount. The Carters also owned important royalty interests. Mapco, Inc., and Underground Storage of Texas, Inc.'s (M.U.S.T.'s) live trial pleadings were the Defendant's First Amended Original Answer and a First Amended Cross–Action.

### Mapco, Inc. Pleadings

Mapco, Inc. (Mapco) alleged and petitioned that if the trial court found that the underground storage cavern in question constituted a part of the mineral estate then the Cross–Plaintiff/Appellant, Mapco, Inc., requested that the court order a partition so that the cavern would be set aside to the Cross–Plaintiff/Appellant, Mapco, Inc.

The District Court ordered that the property be partitioned and awarded a certain 15.797 acre tract of minerals wherein the underground storage facility—a cavern—was located, to one Gordon Speer, who was the successor in interest to Mapco, Inc. As we perceive the record, this amount and award to Gordon Speer was harmonious to Mapco's desires. The $450,000 in money owelty award, made to the Carters, was done to equalize the disparity in the value between the several partitioned tracts. Appellants, in the latter part of the trial, conceded owelty was an equalizer.

### The Decree Ordering Partition

This appeal, sub judice, had its genesis in the trial chancellor's Modified Decree Ordering Partition. In that modified decree, the trial court partitioned a 126.378 acre tract of fee mineral interest owned by the co-tenants thereof. One, and only one, underground storage facility, or cavern, was located under the large tract of 126.378 acres. The underground storage cavern was developed (without the effective consent or permission of the Carters) for the purpose of storing natural minerals, such as natural gas and liquid petroleum gas. No underground storage facility or underground cavern had been formed under the other partitioned tracts that were awarded to Clarence Carter, James Ross Carter and Mrs. Clyde Carter.

### The Underground Storage Cavern

The underground storage cavern was formed by leaching out its area from the underground mineral salt deposit. The bottom of the cavern was located at a depth of approximately 4300 feet and the top of the same cavern was at a depth of approximately 2,505 feet. The storage capacity therein was 644,000 barrels or its equivalent. The cavern was fully capable of storing natural gas and liquid petroleum products and other products compatible with a contact with salt. $9,300,000 was expended by Mapco to develop the cavern in an effort to enter into the underground storage facility business. This $9,000,000 plus figure was at least some indication and evidence of the value of the facility. It was the cost of the cavern.

A well designated as Well No. 1 was begun by drilling operations on or about September 1, 1981. The Appellants, Mapco, Inc., and M.U.S.T. commenced this drilling which they completed on or about February 15, 1982. On or about February 15, 1982, Mapco, Inc., and M.U.S.T. started leaching operations through Well No. 1 for the purpose of constructing a cavern inside of the salt dome.

*The Notice to Appellants*

A certain cogent notice, dated December 9, 1981, was visited and served upon Mapco, Inc., by the Plaintiffs/Appellees demanding that the leaching operations cease and desist and all operations and drillings, in effect, cease and desist. But the leaching operations were flagrantly continued and were completed at sometime in May of 1982. Mapco, Inc., and M.U.S.T. necessarily disposed of about 6,175,000 cubic feet of salt in order to create and complete the cavern. M.U.S.T. admitted that it commenced the salt removal operations without the consent of all the fee mineral owners and commenced salt disposal operations, as well, without the consent of all the fee mineral owners. In fact, Mapco, Inc., and M.U.S.T. possessed but a small, minority interest in the minerals.

*The Unique Cavern*

Noteworthy is the concept that the action for partition below was unusual and, in a sense, unique in character. Gordon Speer, the successor in interest to Mapco, Inc., was ultimately awarded the only existing underground storage facility cavern to the exclusion of the other fee cotenants. The other fee cotenants were merely awarded certain unimproved, unexcavated, mineral salt interest. Some evidence of ample probative value and force exists that the underground cavern is unique in its nature, having a significant fair value of about $1,750,840.

This $1,750,840 value takes into consideration the location of the cavern in relation to certain existing and operating petroleum pipelines and the ability of the cavern to store both natural gas and liquid petroleum products. The approximate cost necessary to develop a similar cavern would be $800,-000. These salient factors, having to do with uniqueness, value, location, ability to store various products and replacement costs, were the basis for determining correctly a gross disparity in value between the various tracts which were partitioned out to the various parties litigant.

A live pleading exists stating this:

"... In the alternative, if the Court finds that the underground storage cavern constitutes part of the mineral estate then the Cross–Plaintiff, Mapco, Inc., *requests that the Court order a partition so that the cavern is set aside in the minerals awarded to the Cross–Plaintiff, Mapco, Inc."* (Emphasis added)

"IV.

"The *Cross–Plaintiff* would show that the Court should appoint commissioners and a surveyor to make a report *on a fair and equitable [sic] in kind."* (Emphasis added)

In the record we find:

"Q. [By Appellants' attorney]: Would you want to or ask in the event of a partition that the cavern be set aside to Mapco in this partition?

"A. That would be my desire, yes."

*The Relationship of Mapco, Inc., to other Corporations*

These questions were posed to, and answers were given by, Mr. Ralph Ball. Mr. Ralph L. Ball, at the time of his testimony, was employed by Mid America Pipeline Company. Mr. Ball was asked:

"Q. Okay. Does Mid America Pipeline Company own Mapco, Inc.?

"A. No, it is wholly-owned subsidiary of Mapco, Inc. Mapco, Inc. is a holding company that is the corporate cover for several corporations.

"Q. All right. *And is Mapco Underground Storage, Inc. also one of those corporations that is owned by Mapco, Inc.?*

"A. *Mapco Underground Storage?*

"Q. *Yes.*

"A. *Yes.*

"Q. And Mapco Underground Storage is the corporation that was designated to kind of handle this project of the Moss Bluff project?

"A. No, sir.

"Q. *Who was designated to handle that?*

"A. *A corporation that was known as Mapco Underground Storage of Texas.*

"Q. *Okay. That's—*

"A. *That's a separate corporate entity.*

"Q. *Owned by Mapco, Inc.?*

"A. *Owned by Mapco and operated by Mid America Pipeline Company.*"

### The Crucial Findings of Fact

The district court, through its chancellor sitting in equity, granted the requested relief that was asked by Mapco, Inc. The careful and complying chancellor found certain original Findings of Fact. Several of the governing, paramount and ultimate findings were:

"6. That MAPCO UNDERGROUND STORAGE FACILITY OF TEXAS, owned by MAPCO, INC., supervised the creation and development of an underground storage facility which was located within that property described in Exhibit 1, 2, 3, 1–A, 2–A, 3–A, 5, 6, and 7, which property was subject to the ownership interests created by said exhibits at the time of the creation and development of the underground storage facility.

"7. That MAPCO UNDERGROUND STORAGE FACILITY OF TEXAS leached an underground storage facility, within a salt formation, which was to be used for the underground storage of natural gas and/or liquified petroleum gas.

"8. That MAPCO, INC. and MAPCO UNDERGROUND STORAGE FACILITY OF TEXAS were advised on or about December 9, 1981 by the TURKEY CREEK MINERALS TRUST to cease and desist operations with respect to the drilling and creation of the well and underground storage facility.

"9. MAPCO, INC. and MAPCO UNDERGROUND STORAGE FACILITY OF TEXAS knowingly disregarded the request of TURKEY CREEK MINERALS TRUST to cease and desist, but instead continued its development and creation operations for the well and underground storage facility.

"10. That MAPCO, INC. and MAPCO UNDERGROUND STORAGE FACILITY OF TEXAS drilled and developed the underground storage facility in bad faith and is not entitled to recoupment of its costs.

"11. That MAPCO, INC. and MAPCO UNDERGROUND STORAGE FACILITY OF TEXAS have never recognized the ownership rights of CLARENCE CARTER, or the TURKEY CREEK MINERALS TRUST with respect to the salt in the land made the basis of this litigation, either in place or removed.

"12. That MAPCO UNDERGROUND STORAGE FACILITY OF TEXAS, through its operations to create the underground storage facility, removed and disposed of 644,000 barrels of salt brine with a fair market value of $1,515,712.00.

"13. That the fair market value at the time of judgment of the surface of the 126.378 acres made the basis of this lawsuit is $900.00 per acre.

"14. That the fair market value at the time of judgment of the mineral estate of 126.378 acres made the basis of this lawsuit is $200 per acre.

"15. The fair market value of the underground storage facility, the mineral salt walls, and sufficient mineral support, as of the date of judgment, is the sum of $1,750,840.00.

"16. That MAPCO, INC. held a 1/8 ownership interest in the minerals in the 126.378–acre tract of land made the basis of this suit until same was conveyed to GORDON SPEER on or about December 28, 1987.

"17. That TURKEY CREEK MINERALS TRUST filed a *lis pendens* in this lawsuit, and the property conveyed by MAPCO, INC. to GORDON SPEER is subject to the jurisdiction of this Court.

"18. That GORDON SPEER paid to MAPCO, INC. the sum of $1,000,000.00 for the purchase of MAPCO, INC.'s ownership of 608 acres which includes MAPCO, INC.'s ownership interest in the 126.378 acres made the basis of this litigation, which consisted of the ownership of all the surface and 1/8 undivided interest in minerals.

"19. MAPCO, INC. and MAPCO UNDERGROUND FACILITY STORAGE OF TEXAS plugged and abandoned the

well and underground storage facility on or about July, 1987.

"20. That MAPCO, INC. and MAPCO UNDERGROUND STORAGE FACILITY OF TEXAS received notice from TURKEY CREEK MINERALS TRUST before it plugged and abandoned the well, to cease and desist its efforts to plug and abandon the well and underground storage facility.

"21. That MAPCO, INC. and MAPCO UNDERGROUND STORAGE FACILITY OF TEXAS knowingly disregarded the request of TURKEY CREEK MINERALS TRUST to cease and desist its efforts to plug and abandon the well and the underground storage facility.

"22. That MAPCO, INC. and MAPCO UNDERGROUND STORAGE FACILITY OF TEXAS plugged and abandoned the well in bad faith.

"23. That the property is subject to a partition in kind but the disparity of value should be made up by way of a money owelty judgment in the amount of $450,000.00 enforceable by execution and charged as a lien against the property, taking into account and adjusting the equities between the parties under the facts and circumstances of this case, which owelty judgment should be in the form of a personal *in personam* money judgment against MAPCO, INC. because MAPCO, INC. failed to demonstrate it is unable to make payment at time of division; because MAPCO, INC. conveyed title to the subject property and is no longer the legal owner; and because an *in personam* judgment is necessary under the facts of this case, to formulate an effective judgment of this Court which adjusts the equities of the parties incident to partition.

"24. The underground storage facility for gas is comprised of walls composed of mineral salt, which mineral salt is owned in co-tenancy, with GORDON SPEER, as successor of MAPCO, INC., owning 1/8, and Plaintiffs, and LANDMARK TRUST owning 7/8, in accordance with their respective ownership interests, as reflected by Exhibit 1, 1–A, 2, 2–A, 3, 3–A, 5, 6, 7, 34 and 35.

"25. The 253rd Judicial District Court, under Cause Number 34,323, styled *Volney R. Hylton, et al. v. Mapco, Inc., et al.*, did not adjudicate the partition rights between the parties, including entitlement to partition in kind, accountings pertaining thereto, or owelty incident thereto.

"26. That plaintiffs filed their Application for Temporary Restraining Order in good faith and diligently prosecuted same, and plaintiffs and their surety, if any, should be released from their bond." (Emphasis theirs)

Each finding has ample support in the record. *State v. Arnold*, 778 S.W.2d 68 (Tex.1989); *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696–697 (Tex.1986).

### The Nature of a Partition Suit

A partition suit has been declared an equitable proceeding with appropriate relief reposing in the clear, clean conscience of the chancellor sitting in equity. One of the proudest boasts of Texas law and jurisprudence is that our District Courts sit as both judges at law and chancellors in equity in a perfectly blended system of law and equity. The trial court was well within its prerogatives and powers to apply the rules of equity when it adjusted the respective rights, duties and obligations between the parties. Indeed, the chancellor had a duty so to do. Historically, the king's chancellor was to keep the king's conscience clear and to see to it that justice was done and that right dealing and fair dealing existed between and amongst the parties. Historically and traditionally, the equity side of the court acts *in personam.* Historically, the chancellor in England was a high, important churchman.

### The Conclusions of Law

Acting as chancellor sitting in equity, the district judge made the following Conclusions of Law:

"4. That MAPCO, INC. and MAPCO UNDERGROUND STORAGE FACILITY OF TEXAS wrongfully removed and disposed of mineral salt belonging to

TURKEY CREEK MINERALS TRUST, CLARENCE CARTER, JAMES ROSS CARTER and CLYDE CARTER, under the facts and circumstances of this case.

"5. That the 126.378–acre tract of land is subject to a partition in kind; and that the underground storage facility and a 15.797–acre parcel of property in as nearly as possible in a conformation of a square with the well located at the center consisting of 100% of the minerals should be set aside and awarded to GORDON SPEER, subject to a compensating owelty *in personam* money judgment, against MAPCO, INC., *adjusting the relative equities between the parties under the facts and circumstances, in favor of CLARENCE CARTER, CLYDE CARTER, and JAMES ROSS CARTER, in accordance with their ownership interest in the amount of FOUR HUNDRED FIFTY THOUSAND DOLLARS AND 00/100 CENTS ($450,000.00), against MAPCO, INC., which owelty judgment is to be secured by a lien against said 15.797–acre tract of land.* The property remaining after the 15,979–acre [sic] is partitioned from the 126.378–acre tract of land (110.581), is to be partitioned first to LANDMARK TRUST, comprised of a 31.582–acre tract, and then to CLARENCE CARTER, JAMES ROSS CARTER, and CLYDE CARTER, into THREE (3) equal 26.333–tracts of land, subject to the outstanding mineral leases with respect to same in favor of TURKEY CREEK MINERALS TRUST.

"6. That at the time of the partition, TURKEY CREEK MINERALS TRUST, LANDMARK TRUST, CLARENCE CARTER, CLYDE CARTER, JAMES ROSS CARTER and GORDON SPEER, as successor to MAPCO, INC., are co-owners and/or lessees of the mineral salt forming the walls and necessary lateral support of the underground storage facility in accordance with their respective ownership rights.

"7. That MAPCO, INC. and MAPCO UNDERGROUND STORAGE FACILITY OF TEXAS abandoned the storage facility on or about July, 1987, and any rights, title, and interest they had acquired in the mineral salt, forming the walls or as necessary lateral support for the storage facility, by judgment or otherwise, reverted back to the original mineral owners in accordance with their respective ownership interest.

"8. That the judgment rendered in Case Number 34,233 in the 253rd Judicial District Court on or about the 11th day of May, 1983, does not constitute *res judicata* or collateral estoppel to plaintiffs' causes of action asserted herein for partition, entitlement to owelty, or accounting incident to partition.

"9. That plaintiffs and their sureties, if any, should be discharged from their bond filed and made in this cause incident to the filing and prosecution of their application for injunctive relief." (Emphasis added)

The Conclusions of Law are correct in view of the amply supported Findings of Fact. *State v. Arnold, supra; McGalliard v. Kuhlmann, supra.*

### The Prior Suit for Injunctive Relief

The judgment rendered in Cause No. 34,-323, styled *Volney R. Hylton, et al v. Mapco, et al,* in the 253rd Judicial District Court of Liberty County, Texas, concerned itself with an application for temporary injunction and also petitioned for a declaratory judgment decreeing that the cross-action was a controversy that met the requirements of Tex.Rev.Civ.Stat.Ann. art. 2524–1 (1965) (repealed 1985). The judgment decreed, generally, that the mineral fee owner, or the lessees of the mineral fee owner, actually owned the salt and salt deposits in question. But this prior proceeding was not a partition suit in any sense. That judgment, signed May 11, 1983, simply did not address, or deal with, the rights, obligations and duties of the parties relevant and incident to the partition suit. That judgment, of May, 1983, was not res judicata in the present partition suit.

The parties, issues, questions and relevant evidence were different and, subsequent to May 11, 1983, certain new, additional facts and changed circumstances

(which arose much later) necessarily altered materially the rights and the relationships of the parties. The Court sitting in equity arrived at a conclusion of law that the judgment entered in case No. 34,323 did not constitute res judicata or collateral estoppel to the plaintiffs in the case before us, because new and different causes of action were asserted for partition, for the entitlement and awarding of owelty and for an accounting incident to the equitable partition suit. Consequently, the judgment in Cause No. 34,323 did not constitute res judicata or collateral estoppel to the modified decree ordering partition and appointing commissioners which was signed in the present cause on March 14, 1988, some four or five years after the judgment of May 11, 1983. Nor was res judicata or collateral estoppel a ban to the partition decree below.

### The "WARNING, NO TRESPASSING" Signs

■ Plaintiffs below further and importantly demanded that the operations on the property cease. "WARNING, NO TRESPASSING" notices at the entrance to the property in question were actually placed and posted; further, notice was given that violators would be prosecuted to the limit of the law if the violators continued to leach out the salt from the underground salt formation to form any caverns. The cavern leached out had a capacity to store about 644,000 barrels of hydrocarbons. By completion time, the then present market for underground hydrocarbon storage facilities had unfortunately collapsed. Efforts to rent the storage facility at that time were unsuccessful. Then, seeking an income tax write-off to diminish its substantial losses, M.U.S.T. sought and obtained a permit from the Texas Railroad Commission to plug the "jug" well to the cavern with concrete. M.U.S.T. and its parent corporation recognized the governing, paramount applicability of the TEXAS NATURAL RESOURCES CODE ANNOTATED.

The record clearly reflects that the *Appellants had actual notice* of the claimed trespasses *and the fact that any violators or trespassers would be prosecuted to the fullest extent of the law,* if any violators leached out salt from the underground salt formation in order to form any caverns. Turkey Creek and the two individuals, Hylton and Rhodes, attempted to prevent the plugging of the hole.

### The Later Additional Findings of Fact

Of paramount significance are certain additional or supplemental findings of fact. They are:

"1. That MAPCO, INC. as equitable owners of the subject property utilized MAPCO UNDERGROUND STORAGE OF TEXAS, INC. as a part of an unfair device to achieve an inequitable result, which inequitable result can only be remedied by awarding Plaintiffs a personal *in personam* judgment against MAPCO, INC.

"2. That the mineral salt comprising the underground storage cavern's lateral support is a part of the mineral estate made the basis of this lawsuit.

"3. That MAPCO UNDERGROUND STORAGE OF TEXAS, INC. is a wholly owned subsidiary of MAPCO, INC.

"4. That MAPCO, INC. directed and controlled the acts, omissions and activities of MAPCO UNDERGROUND STORAGE OF TEXAS, INC. with respect to the creation, operation and abandonment of the underground storage facility made the basis of this suit.

"5. That the title that MAPCO UNDERGROUND STORAGE OF TEXAS, INC. held in the surface, minerals, or with respect to the underground storage facility made the basis of this suit, was as the agent and nominee of MAPCO, INC., who was the true party in interest and equitable owner of the subject property.

"6. That GORDON SPEER holds title as the successor in interest to MAPCO, INC., who was the equitable owner of the property deeded to GORDON SPEER made the basis of this suit."

### The Public Policy Declaration by the Legislature

■ The Texas Legislature has enacted a declaration of public policy regarding nat-

ural gas and hydrocarbons storage in underground facilities and said policy declared underground storage of natural gas promotes conservation of that natural resource and promotes, in addition thereto, the public interest and welfare of Texas. There are certain statutorily required prerequisites and steps with respect to the creation and use of natural gas and hydrocarbons storage facilities. The Act, TEX. NAT.RES.CODE ANN., Subchapter F, sec. 91.-171, et seq. (Vernon Supp.1991), entitled "Underground Natural Gas Storage and Conservation Act of 1977", establishes certain relative and correlative rights and duties between the surface owners, the mineral owners, and the storers of these natural resources. Query: Did Mapco ever comply with these statutory requirements? The record shows Mapco, Inc., did not comply. At oral submission, Mapco, Inc., conceded that it did not comply initially.

The rule of statutory construction in our state has been established for a long duration. The rule declares that a statute should be given a sensible, fair construction and a construction that would carry out the purposes of the Act. No court should construe the Act in a mode to nullify the Act or to defeat its purposes. *Brazos River Conservation and R. Dist., et al v. Costello*, 143 S.W.2d 577 (Tex.1940). *Walker v. City of Houston*, 466 S.W.2d 607 (Tex.Civ.App.—Houston [14th Dist.] 1971, no writ); The majority of our court heeds this Act and adheres to the public policy it enforces.

Mapco and M.U.S.T. had failed to acquire the necessary percentage of ownerships in the minerals and the royalty interests. If these necessary interests could not have been obtained through voluntary means, further steps should have been taken through eminent domain proceedings. The Act should have been followed; but the Act was ignored initially. Hence, the Appellants' creation of this particular storage cavern for natural resources, especially natural gas, was unlawful. Therefore, Appellants acted unlawfully and in bad faith; the chancellor so found on ample evidence of cogent, compelling, probative force and value. Traditionally, a court of equity

must not permit a party to benefit by his or its unlawful conduct. *Grohn v. Marquardt*, 657 S.W.2d 851 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.).

## The Effect of the Findings of Fact and Conclusions of Law

■ Findings of fact made in a bench trial, especially in an equitable partition proceeding, are entitled to the same force, dignity, and consideration on appeal as a jury verdict based on answers to certain special issues. If these findings of fact are supported by some competent evidence of probative force, they must not be disturbed or reversed on appeal unless these findings of fact are so against the great weight and preponderance of the evidence as to be clearly unjust and manifestly wrong. *See Houston Natural Gas Corporation v. Pearce*, 311 S.W.2d 899 (Tex.Civ.App.—Houston 1958, writ ref'd n.r.e.).

■ Under this record, our opinion is that this intermediate court cannot overthrow the findings of fact and conclusions of law made below. An intermediate court reviewing the trial bench's findings of fact must review the record to see if the findings of fact are supported by any evidence of probative force and value giving credence and consideration only to the evidence favorable to the findings and the reasonable inferences from that evidence. If findings of fact are susceptible to different constructions, then they are to be interpreted and construed as being in harmony with the judgment and as supporting the judgment. *See Brown v. Frontier Theatres, Inc.*, 369 S.W.2d 299 (Tex.1963).

## The Current Standard for Piercing Corporate Veils as Between Corporations in a Contract Setting

■ The trial court found that Mapco was the owner and the real party at interest in the property in question. *Castleberry v. Branscum*, 721 S.W.2d 270 (Tex.1986) enunciated the standards for the piercing of corporate veils between corporations in a contract setting. The current test can be defined (exercising common sense and jus-

tice, while recognizing the legalistic separate corporate existences) as a standard bringing about an equitable result. In *Castleberry, supra,* the Supreme Court pronounced a flexible approach requiring the fact-finder to decide whether the result is equitable or inequitable. The record before us reflects that there is ample evidence and testimony of probative value and force showing Mapco, Inc., was the beneficial and equitable owner of the property in litigation; that Mapco, Inc., directed and controlled the acts, activities, omissions and commissions of M.U.S.T.; that the title that M.U.S.T. held in the underground storage cavern was a title held by M.U.S.T. as an agent and/or nominee of Mapco, Inc., which was the true party at interest and the real equitable owner of the subject property. Such a corporate webb or fiction cannot be permitted to justify a wrong. *See Thomas v. Southwestern Settlement and Develop. Co.,* 132 Tex. 413, 123 S.W.2d 290 (Tex.1939); *City of Dallas v. Wright,* 120 Tex. 190, 36 S.W.2d 973 (Tex.1931).

### *A Cardinal Principle of Equity*

■ Furthermore, a cardinal principle of equity is that the chancellor will not suffer a right to be defeated by the lack of a reasonable, practical remedy. *See Miers v. Brouse,* 153 Tex. 511, 271 S.W.2d 419 (Tex.1954). Thus, inasmuch as there was a sale of the property in question—the cavern—from Mapco, Inc., to Gordon Speer and inasmuch as Mapco, Inc., contracted to receive *a million dollars in consideration for the sale* of the subject property and cavern; then a decree in equity providing only that the owelty allowed would be secured by a lien against the property without also a personal *in personam* money judgment against Mapco would eviscerate and disembowel the equity powers and duties of the chancellor and would put the original plaintiffs, Appellees here, to the frustration and practical defeat of a right without a remedy. Again, the one million dollars consideration for the cavern—being a more recent sale—was evidence of its fair market value.

The right of equitable partition has been declared paramount and superior to the occupying cotenant's claim of homestead. Owelty, having been assessed in adjusting equities in an equitable partition proceeding *has been recognized as being in the nature of purchase money,* being very similar to purchase money as secured by a first vendor's lien note. Such first vendor's lien notes are *personal obligations of the makers* as well as being secured by the usual deed of trust. *Courts in equity have plenteous power to award owelty as a necessary incident to an equitable partition.*

Each cotenant has a right to demand partition; that is, equitable partition of the real estate. Upon the dissolution of the cotenancy and upon the actual partition, the parties are vested with certain rights. Examples are that one tenant may have to account to another cotenant for rents or profits received, any waste committed, any monies fraudulently obtained, any betterments made or for the payment of taxes. These are all matters incident to a partition suit. *Sayers v. Pyland,* 139 Tex. 57, 161 S.W.2d 769 (Tex.1942). *Sayers* was written by one of Texas' great Chief Justices, Alexander—no dissent.

The power to award owelty has from olden times been regarded as a necessary power to the act of partitioning real property. *Sayers, supra.* Certainly the holding in *Sayers* is compatible with a chancellor adjusting all the equities; and, if necessary (as here), to fix a lien to secure the actual payment of the owelty. Moreover, the bench in a partition proceeding, according to the nature of the property, may necessarily have to divide the property into unequal shares of unequal values; but, nevertheless, fix a lien or award owelty, or both, against the larger share in favor of the parties or cotenants receiving the smaller shares, which award for the difference thereof is known and recognized as owelty.

■ Furthermore, an intermediate appellate court, in reviewing a no evidence challenge to a bench trial, must disregard all evidence contrary to the trial court's findings. If there exists any evidence which would support the findings and judg-

ment below, then the trial court's judgment must be upheld. *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 696, 697 (Tex.1986). Furthermore, testimony constituting more than a scintilla of evidence will support the trial court's findings in a non-jury proceeding. *See State v. Arnold,* 778 S.W.2d 68 (Tex.1989).

### The Texas Natural Resource Code

The *"Underground Natural Gas Storage and Conservation Act"* TEX.NAT.RES. CODE ANN., sec. 91.171 (Vernon Supp.1989), as amended, originally became effective the latter part of 1977. The subchapter F became effective in June of 1979. The Natural Gas Storage and Conservation Act contains a specific declaration of policy in Section 91.172 thereof. The diktats of the policy read:

"Sec. 91.172. *Declaration of Policy*

"The underground storage of natural gas promotes the conservation of natural gas, permits the building of reserves for orderly withdrawal in periods of peak demand, makes more readily available natural gas resources to residential, commercial, and industrial customers of this state, provides a better year-round market to the various gas fields, *and promotes the public interest and welfare of this state."* (Emphasis added)

We think a fair, reasonable construction of the Act is applicable to this appeal. The Act certainly gives the Railroad Commission of Texas an important administrative role. Appellants later on, during this dispute, obtained a permit from the Railroad Commission of Texas to plug the Well No. 1 permanently with cement. At least, the Appellants must have thought that the Railroad Commission of Texas, under this said Act, was the proper agency to approach for the permit to permanently plug the well. Query: Or did Appellants choose to use the Act and engage the Railroad Commission when it suited them—but not otherwise?

### Case Law Ownership of Minerals

■ Texas adopted the view that interest in minerals, such as oil, gas, salt and other minerals are susceptible of ownership in place in the ground prior to production of the minerals at or on the surface. The Texas rule is that this interest in minerals is an interest in real property. Thus, the fee mineral owners retain a property ownership, right and interest after the underground storage facility—here, a cavern—had been created. These same fee mineral owners are vested with ownership rights, including, of course, entitlement to compensation for the use of the cavern. Stamm, "Legal Problems in the Underground Storage of Natural Gas", 36 TEXAS L.REV. 161 (1958). Thus, Texas law would recognize the continuing property ownership interest of the fee mineral estate owners in the cavern even if the natural gas storage act is inapplicable. We conclude, however, that the Act is applicable.

An outright reservation or grant of ownership and title of minerals in and under land is a fee simple absolute estate in the minerals in place. Appellees have shown their fee simple title in an undivided, majority interest. Appellees' majority interest is vast when compared to that of Appellants. *See Alford v. Krum,* 671 S.W.2d 870 (Tex. 1984). In this record, the Appellee mineral owners clearly owned the salt in place, as is shown by the exhibits admitted into evidence. Salt has been recognized as a mineral in Texas. *See State v. Parker,* 61 Tex. 265, at 268 (1884). The court wrote:

"It has been apprehended that by no one in any way familiar with the elementary principles of chemistry and mineralogy, would salt be classed otherwise than as a mineral substance...."

■ The chancellor was then eminently correct in finding as a fact and concluding as a law point that the walls of the underground storage cavern belonged to the fee mineral interest owners. See First Amended Finding of Fact No. 24, First Amended Conclusion of Law No. 6 and Supplemental Finding of Fact No. 2.

Furthermore, the dissent, in our opinion, miscalculated the damage and owelty issues and the elements of damages and owelty, failing to consider or reckon with the fact that there was an existing cavern

with its exact location and unique capabilities. The dissent figures that the value of the mineral estate was $200 per acre and then reached the conclusion that the total value of the mineral estate was about $25,275, failing to consider the existence of the storage facility. Then the dissent insists that the trial court failed to consider the cost of creating the cavern even though the chancellor specifically ruled out Appellants' right to cost on a sufficient, evidentiary basis. The dissent consistently refuses to recognize that the chancellor was balancing the equities. In some manner, the dissent recites that there is, first, no evidence and then insufficient evidence to support the owelty award because the whole mineral estate is only worth $25,275.

The dissent states, in substance, that: "Appellees cannot be entitled to owelty under the findings of fact in this case." The findings of fact below are directly to the contrary, as are the conclusions of law.

Then, the dissent recites that a cotenant producing minerals and creating an improvement, has a duty to account to its non-consenting cotenants for the minerals produced, less the necessary and reasonable costs of producing those minerals, ignoring the bad faith findings. Then the dissent illogically thinks that the record shows that the cost of production was far greater than the value of the minerals produced; that is simply not the issue here. The dissent misses the paramount, relevant issue. The present controlling issue here is not the value of the minerals produced but, rather, the value of the cavern, which was created in bad faith. The dissent has simply misjudged the owelty issue in this case because it used the value of the minerals produced rather than the value of the bad faith, unlawfully created cavern. The dissent insists that the salt strata was uniform throughout. That may, or may not, be so. But it is glaringly clear that the cavern was not uniform throughout the entire 126–plus acre tract because it existed solely under a 15–plus acre tract of land awarded, at the specific request, to Mapco, Inc., and to its successor in interest, Gordon Speer, for a consideration of one million dollars. Speer bought the same clearly subject to a proper and timely recorded lis pendens notice.

Mapco and M.U.S.T. were interested in producing an underground storage cavern for gas or hydrocarbons or minerals incompatible with salt. Then, finally, the dissent states that (if the cavern was considered as an improvement) M.U.S.T. created the cavern and is entitled to its improvement without regard to the enhancement of the value of the estate partitioned. We disagree. The dissent simply fails to recognize the incidents to a suit for partition in equity.

Although the chancellor made extensive findings of fact and conclusions of law, he did not (nor was it necessary for him to) set out the equitable principles or *theories of equity* upon which he reached his justified conclusions. It is obvious that the chancellor was applying the clean-hands doctrine and also the balancing-of-the-equities doctrine. The chancellor did that which was right, fair, just and equitable. He insisted upon right dealing and fair dealings between and among all the parties.

The dissent recites, in substance, that: "The $450,000 owelty award is in fatal conflict with the uncontested finding of the value of the partitioned mineral estate."

Hence, the dissent totally ignores the existence of a completed underground storage cavern capable of storing gas, oil and other hydrocarbons. The Appellees, Plaintiffs below, owned an undivided, but large majority, interest in the fee title and fee estate to the minerals in place and, as such, they had a fee title interest in the cavern after the minerals were extracted. *See Alford v. Krum*, 671 S.W.2d 870 (Tex. 1984). As an appurtenance or incident to this fee mineral estate, the Plaintiffs/Appellees had the right to participate in lease benefits and the right of a fractional interest, being a large majority fractional interest, of any possibility or probability of a reverter. *Alford v. Krum, supra.* On the value question, the dissent overlooks the one million dollars consideration from Speer to Mapco, Inc., the nine million dollars plus construction cost and the unilater-

al plugging of the well, inter alia. The record, we think, reflects that the Appellees owned 5/8ths interest—Appellants only 1/8th interest.

The excavation, or the formation, of the cavern does not defeat the title of the owners of the fee estate in the minerals. Hence, the Plaintiffs/Appellees owned an undivided but majority fraction of the ownership and title to the cavern. The Appellants recognize this ownership right because they asked that the cavern be set aside to Mapco, Inc., which, in turn, had conveyed it to Gordon Speer for one million dollars. If Mapco, Inc., Ralph Ball and Gordon Speer had felt that the cavern was totally valueless or that the Plaintiffs/Appellees had no interest whatsoever in it, why would they request that the chancellor, acting in equity in a partition suit, specifically set the cavern aside to Mapco, Inc.? The fact that Mapco, Inc., specifically asked for this relief is shown by pleadings and the brief of Appellants.

In the prayer of its live pleading, the Cross–Plaintiff, Mapco, Inc., prays that the Court decree a partition of the oil, gas and other minerals and set aside the part that contains the storage facility to the Cross–Plaintiff and that the Cross–Plaintiff have this relief in equity.

The underground storage cavern was formed out of the underground mineral salt, being the mineral estate. Appellees own all rights and appurtenances to their mineral estate.

There exists a definite finding that the fair market value of the underground storage facility, as of the date of judgment, was the sum of $1,750,840. Further, the record clearly proves that Mapco, Inc., and M.U.S.T. received notice, before plugging and abandoning the "jug" well, to cease and desist plugging and abandoning the well. Hence, the well was rendered useless. *The chancellor found the plugging and abandoning of the well was done in bad faith. There are a number of other findings which support the judgment.* To recite them all, here, would unduly lengthen this opinion. There are numerous, specific findings of fact, firmly supported by the cogent evidence, upon which to properly base the money owelty judgment in the amount of $450,000 as well as specific findings why the owelty judgment should be made a personal *in personam* money judgment against Mapco, Inc., to be made secure by a lien. There is a specific finding that the walls of the underground storage cavern are composed of mineral salt, which mineral salt is owned in cotenancy by the parties.

The conclusions of law possess forceful declarations to support the judgment. Significant are the requested findings of fact and conclusions of law proffered by the Defendants/Appellants. These the chancellor refused to approve or sign, thereby clearly indicating his disapproval of the same and his failure to find the same and his refusal to conclude the law as requested by Appellants.

In addition, the Supplemental Findings to the First Amended Findings of Fact and the Supplemental Conclusions of Law filed herein clearly support the decree below.

### The Testimony of the Experts

Dr. Clarence O. Durham, Jr., testified. He was a graduate geologist. He received his undergraduate degree from the University of Texas. He did graduate work at the University of Texas and completed his doctorate at Columbia University. He had studied extensively the bed sediments, regional geology and economic geology of the Gulf Coast.

This Ph.D. had been elevated to a full professorship at L.S.U. He had made extensive studies of salt domes and the geology pertaining thereto along the Gulf Coast. He had actually observed the mining of salt in underground formations. He testified about two salt domes located in Texas; one, being the Pierce Junction salt dome. These facilities were selling their brine. He testified that there was a market for brine salt. He testified that the market price for brine ranged from about $5.86 per short ton of salt to about $6.21. He testified that the price of the brine taken from the 644,000 barrels would equal about $1,308,247. This Ph.D. geologist calculated

the interest of Appellees to be about $1,212,570. Upon cross-examination, the geologist did agree that there were some impurities in the salt, approximately 8 or 9 percent, which would reduce the fair market value only about 10 percent. This expert testimony could and should have been considered and weighed carefully by the chancellor.

Another expert witness was proffered by the Appellees. His name was G. Mac Riley. He was a certified public accountant. He had extensive background and experience in oil and gas evaluations. He had worked for Texaco. In fact, he had experience and had done work in a similar situation involving similar litigation. He had experience in doing evaluations of oil and gas facilities, including salt dome storage caverns as well as other types of storage facilities and cavities and caverns. He testified that he was familiar with the evaluation processes for a salt dome storage facility and for other types of storage facilities.

This expert, Riley, was asked specifically what the fair market value of the cavern, itself, was, separated from any other facilities that surround it. *He had an expert opinion. His expert opinion was that the fair market value of the cavern was $1,750,840.* That large amount is certainly some evidence that the chancellor could and should consider and weigh. Among other matters, he based his expert opinion on comparable sales of similar properties. This is an accepted, recognized method. Indeed, this method is likely the best one. He explained thoroughly and in detail how he arrived at this fair market value figure and the chancellor had a right and, we think, a duty to weigh its value and his credibility. That was the chancellor's business; that was what he was doing.

The other opinion insists and finds that the cost of production of the minerals was "far greater than the value of the minerals produced". But that is simply not the correct issue before us. This is an equitable partition suit, to partition the mineral estate, including the cavern. At least, this is the case on appeal. This appeal, as presented, is not to decide the value of the minerals produced in relationship to the cost of their production.

Furthermore, the dissent would disallow owelty but, nevertheless, in part, would send back the partition suit on remand. Apparently, then, adhering to the dissent, the chancellor would have to divide the cavern into specific, separate parts and make a partition in kind of the cavern itself. This result no party desires.

But the dissent's paramount flaw is its refusal to acknowledge and follow *McGalliard v. Kuhlmann, supra,* and *The State of Texas v. Albert Arnold, supra.*

### The Two Basic Concepts Relating to Minerals in Place

■ Different jurisdictions recognize two basic concepts or theories relating to minerals in place. One theory has been described as the incorporeal mineral ownership concept. Texas has uniformly followed the other concept. This is the corporeal mineral ownership as real property. Our state adheres to the view that ownership and interest in ownership and minerals are ownership in minerals in place in the ground prior to production. *These minerals are actual corporeal interest in real property.* Such jurisdictions, as Texas, considering minerals to be corporeal interest in real estate, have virtually uniformly followed the rule of law that mineral owners retain and still possess and own an ownership interest after the underground storage facility has been constructed and completed or the stratum depleted. These mineral owners are vested with ownership and title rights, including compensation *for the use of the cavern. Oil and Gas Law* (Williams and Meyers), § 222; 36 TEXAS L.REV.—*"Underground Storage of Natural Gas",* page 161 (1957); *Central Kentucky Natural Gas Company v. Smallwood,* 252 S.W.2d 866 (Ky.Ct.App.1952). *See* A.W. Walker, Jr., *"The Nature of the Property Interests Created by an Oil and Gas Lease in Texas,"* 7 TEXAS L.REV. 103 (1928). *Stephens County v. Mid–Kansas Oil & Gas Co.,* 113 Tex. 160, 254 S.W. 290 (1923). Texas has recognized the right of the owner of a severed mineral estate to its

fee ownership of the minerals in place, coupled with the right to enter upon the surface owner's property in order to explore for, and produce, the minerals. Thus, under well-recognized, decisional law, the continued ownership interest in the mineral estate in an underground storage facility is acknowledged and harmonious with the decisional law of our state.

### The Comprehensive Natural Resources Code

The solons of Texas enacted a comprehensive set of statutes—indeed, a Code—that may be cited as the *"Underground Natural Gas Storage and Conservation"* Act of 1977. The Texas lawmakers made a formalistic, legislative declaration of public policy. TEX.NAT.RES.CODE ANN. § 91.172 (Vernon Supp.1991) provides that the underground storage of natural gas and other compatible minerals promotes the conservation of these important minerals, permitting the building of reserves and reservoirs for orderly withdrawals at time of peak demands. These sections make more readily available to residences, commercial and industrial consumers natural resources.

Natural gas includes any gaseous materials predominantly made up of hydrocarbons or gaseous mixtures thereof. The Act applies to these natural resources in either their original or manufactured states. The Act even applies to gas or gaseous materials which have been processed to separate the said natural resource into one or more of its component parts after its extraction and production from the earth. A storage facility includes any sand or formation used, or to be used, for the underground storage of these important minerals. Certain hydrocarbons are recognized as partly gaseous in nature and partly liquid in nature.

This comprehensive set of statutory enactments spells out the appropriate statutory and legislatively-maintained scheme dealing with the creation, use and regulation of gas and hydrocarbon storage facilities. This Court promulgates the relative rights, duties, obligations and interests among surface owners, mineral and royalty owners and storers. We perceive that the NATURAL RESOURCES CODE should be construed as the exclusive, if not the highly preferred, method of creating, operating and regulating gas and hydrocarbon storage facilities. A salutary and correct rule of interpretation of statutes is that these rules should be given a sensible, accurate and fair construction in order that the same may carry out, effectively, the several purposes for which the same were enacted. A construction of these important rules, in such a manner as to nullify them or make them practically void, is not to be adopted. An appellate court should not defeat the legislative purposes and intents. *Brazos River Conservation and R. Dist. v. Costello*, 135 Tex. 307, 143 S.W.2d 577 (1940); *Walker v. City of Houston*, 466 S.W.2d 607 (Tex.App.—Houston [14th Dist.] 1971, no writ). Indeed, our Court should realistically, pragmatically and liberally construe the NATURAL RESOURCES CODE to attain its purposes and to promote a high quality of justice. Adhering to this important code, the Railroad Commission of Texas should have been approached and, after proper procedures, the correct findings should have been made by the Commission. TEX. NAT.RES.CODE ANN. § 91.174 (Vernon Supp. 1991). The Railroad Commission has jurisdiction to supervise the construction and the operation of such storage facility. The Commission has numerous other powers. TEX.NAT.RES.CODE ANN. § 91.175. The storage operations, and especially the storer, must proceed and act in good faith. Appropriate monthly reports to the Commission should be brought forth.

The storer's right to use any formation for an underground storage facility is regulated and controlled by TEX.NAT.RES.CODE ANN. § 91.179 (Vernon Supp.1991). This section clearly sets parameters. The storer must have necessarily acquired by some appropriate means at least 66 2/3% of the ownership of the minerals and 66 2/3% of the royalty interest. The storer owned only 1/8th the record demonstrates. If these necessary acquisitions cannot be brought about by negotiations, then a storer may condemn, and has a right to condemn, any subsurface formation, including

the condemnation of all mineral and royalty rights as are reasonably necessary. TEX. NAT.RES.CODE ANN. § 91.180 (Vernon Supp. 1991).

All proceedings of condemnation or acquisition should be in accordance with the rules of Eminent Domain. Indeed, the statutory scheme is complete. Even upon abandonment of the storage facility, the property rights, both mineral rights and surface rights, revert to those who previously owned those mineral interests, or their heirs, successors or assigns.

The law, of course, provides for just and reasonable compensation for the condemned mineral and royalty interest. A basic concept in an eminent domain proceeding is to award just and fair compensation to the mineral owner or co-tenant and to the royalty owner. We perceive that the Appellants here have simply failed to comply with the NATURAL RESOURCES CODE. The cavern was created in an operation that was not consistent with the statutes and, in that sense, the same was unlawful. A chancellor, traditionally and historically was a high churchman, sitting in equity. The chancellor would disallow relief to such a party. The equity court would not suffer such a party or parties to benefit from their non-statutory, unlawful, wrongful actions. Furthermore, the chancellor could have properly concluded and found that the operations of this underground project were done in a non-bona fide manner and that the method of plugging the well could reasonably indicate to the trial bench that this facility was permanently abandoned. The Carters were thwarted, if not abused. TEX.NAT.RES.CODE ANN. §§ 91.172, 91.173, 91.174, 91.177, 91.179, 91.180, 91.181 and 91.184. Hydrocarbons could mean, in the industry, gas or the products of oil and gas. TEX.NAT.RES.CODE ANN. § 91.201 and § 85.001(a)(4).

The Bench heard from some witnesses a certain limited amount of profanity and vulgarity. We certainly do not decide this appeal on that basis. However, the trier of facts, in his broad discretion, may have considered this language in connection with the credibility of these same witnesses and the weight to be given their testimony. The District Bench was in a superior position to judge the demeanor, tone or voice, the ring of truth, body language, actions, manner of speech, general attitude and any other facets of the various witnesses. We are not in a position to do so. We pass on a complete, but cold, record.

Judgment below is affirmed.

AFFIRMED.

BURGESS, Justice, dissenting.

I respectfully dissent. I would utilize the original opinion, with slight revisions, at 786 S.W.2d 368 (Tex.App.—Beaumont 1989). While I have many disagreements with the majority, in an effort towards brevity, my dissent is in the following areas.

### Res Judicata and Collateral Estoppel

Appellants argue appellees are bound by the pronouncements of the declaratory judgment entered in an earlier suit between trustees for Turkey and M.U.S.T. and Mapco, Inc., declaring the mineral lessee owns the salt in the mineral estate of the same tract, the surface owner has the right to leach caverns out of the salt formation for the purpose of creating storage facilities, the cavities thus formed would belong to the surface owner, the mineral owner has the right to mine the salt if the operations do not make unreasonable use of the surface, the mineral owner can claim the salt leached from the salt formation if it is removed within a reasonable time, without making an unreasonable use of the surface, and the mineral owner pays the surface owner the reasonable expense of bringing the salt to the surface, and if the mineral owner did not claim the salt within a reasonable time, the surface owner may dispose of it. Turkey was a party to this suit and bound by it. Appellants argue the Carters were represented by Turkey as their mineral lessee and were collaterally estopped by the terms of the judgment and the issues determined therein.

A party seeking to invoke the doctrine of collateral estoppel must establish (1) the facts sought to be litigated in the second

action were fully and fairly litigated in the first action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action. *Bonniwell v. Beech Aircraft Corp.*, 663 S.W.2d 816 (Tex.1984). Persons are privies to a judgment whose succession to the rights of property therein adjudicated are derived through or under a party to the action. Likewise, a person is bound by the adjudication of a litigated matter as if a party where he has a proprietary or financial interest in the judgment. *Benson v. Wanda Petroleum Co.*, 468 S.W.2d 361, 363 (Tex.1971). The parties will be bound by estoppel where they represented the same legal right. *Olivarez v. Broadway Hardware, Inc.*, 564 S.W.2d 195 (Tex.Civ. App.—Corpus Christi 1978, writ ref'd n.r. e.). Appellants argue the Carters, by virtue of their mineral lease with Turkey, which was a party to the first suit, are estopped to deny the cavern belongs to appellants.

The judgment here appealed denied appellees' waste and damage claims and awarded owelty. Partition was not decided in the first suit. Appellants do not object to the finding of fact that the prior judgment did not adjudicate partition or owelty. However, they argue the enhanced value of the property set aside to Speer due to the presence of the cavern cannot be considered in the partition because the prior litigation awarded the cavern to the surface owner, therefore the trial court's findings that the salt walls of the cavern belonged to the mineral estate and were amenable to owelty were in error.

The burden of establishing collateral estoppel is on the party seeking to invoke it. *Tompkins v. Hooker*, 200 S.W. 193 (Tex. Civ.App.—Texarkana 1917, no writ). At trial, appellants introduced a judgment in the prior case which established M.U.S.T. obtained a declaratory judgment against Turkey. They established through cross-examination of Turkey's trustees that Turkey was the lessee of the mineral interests of the Carters, the leases were signed before the first suit was filed, the Mssrs. Carter knew what was going on between Turkey and M.U.S.T. before the first suit

was filed, and James Ross Carter supposed Turkey's trustee had a power of attorney to sue on his behalf, and anything the trustee did was all right with him. Apparently, the Carters were not named as parties in the first suit, nor was Turkey named therein as their representative. We do not find in the record of this cause a power of attorney giving Turkey the power to file the first suit. One of the Carters testified he would receive 1/3 of a judgment against Mapco, but appellants did not establish this to be true of the first suit. The mineral lease states the lessor retains a 1/3 royalty interest and shall receive 1/3 of any rents received by a storer, presumably in the cavern. The interests of Turkey and the Carters are not identical; Turkey owned the mineral interests subject to the royalty interests of the Carters. In the first opinion, the majority held the trial court did not err in failing to find the Carters were collaterally estopped by the findings in the first suit, 786 S.W.2d at 371. I would now hold completely opposite as we are bound by this court's analysis of res judicata in *City of Bridge City v. City of Port Arthur*, 792 S.W.2d 217, 224 (Tex.App.— Beaumont 1990, writ denied).

## Valuation and Division of the Mineral Estate

Appellants argue the owelty award is incorrect because the salt is evenly distributed throughout the tract, the salt has no market value, the amount removed from the minerals was less than M.U.S.T.'s share as a cotenant, there is no inequality because M.U.S.T.'s successor is entitled to use the cavern, and the award is 142 times the value of the portion of the mineral interest awarded to M.U.S.T.'s successor.

It was undisputed the salt was evenly distributed throughout the property. Appellees' expert witness testified the salt had a market value as salt and a separate value if removed as brine as a result of the leaching operation. He testified there was a market for salt and brine, although the total available supply may exceed demand. Appellees argued at trial the salt removed by M.U.S.T. had a value of $947,319.

There was sufficient evidence to establish the salt had some value. However, the uncontested findings of fact entered by the trial court state the value of the mineral estate was $200 per acre, for a total of approximately $25,275 for the entire mineral estate, and $900 per acre for the entire surface estate. The finding submitted by appellees and contested by appellants was the underground storage facility was worth $1,750,840 including the salt walls and mineral support, which the trial court found to be part of the mineral estate. The findings do not state the cavern ownership or right of use. The $450,000 owelty award is in fatal conflict with the uncontested finding of the value of the partitioned mineral estate. Apparently, the trial court considered some unspecified part of the value of the underground storage facility to belong to the mineral estate, but there is no finding of fact on that issue. Nor do the findings of fact specify what costs of creating the cavern are considered.

The judgment stated Speer should have the underground storage facility and a 15.797–acre parcel with the well at its center set aside to him as his 1/8 mineral interest, subject to the compensating owelty judgment. The evidence produced at trial about the value of the walls of the cavern was limited to testimony regarding the value of the cavern itself. There are no findings of fact to support a judgment attributing the value of the cavern to the mineral estate, which is essential to its being considered for owelty purposes. There is insufficient evidence to support the $450,000 award of owelty out of an estate valued $25,275. Appellees cannot be entitled to owelty under the findings of fact in this cause.

The structure was created at the sole expense of M.U.S.T. The cost of creating the structure was $9,300,000. Appellees argue the cost of creating a similar cavern would be $800,000. As a cotenant producing minerals and creating an improvement, M.U.S.T. had the duty to account to its non-consenting cotenants for the minerals produced, less the necessary and reasonable costs of production. *Cox v. Davison*, 397 S.W.2d 200 (Tex.1965). It appears from the record the cost of production was far greater than the value of the minerals produced. There is some evidence the costs of production were not reasonable through testimony it cost less to dig the salt out than to leach it and that the value of solid salt is greater than brine. This would support an action for damages, which was denied by the court and not appealed from. It would not support owelty on partition. Appellees argue appellants acted in bad faith in creating the cavern, and therefore are not entitled to contribution for the cost of creating it. A non-joining cotenant has no obligation to pay for improvements. *Perez v. Hernandez*, 658 S.W.2d 697 (Tex.App.—Corpus Christi 1983, no writ). Neither does he own the improvements erected at the sole expense of his cotenant. Where improvements have been made on the partitioned property, the improved portion will be allotted to the joint owner who had made the improvement. *Cleveland v. Milner*, 141 Tex. 120, 170 S.W.2d 472 (Tex.Comm'n App.1943, opinion adopted); *Bouquet v. Belk*, 404 S.W.2d 862 (Tex.Civ.App.—Corpus Christi 1966, writ ref'd n.r.e.). If the improvement cannot be allotted to the party who made it, then that party has a right of compensation from the cotenants receiving the improvement. *Whitmire v. Powell*, 103 Tex. 232, 125 S.W. 889 (1910); *Poenisch v. Quarnstrom*, 386 S.W.2d 594 (Tex.Civ.App. —San Antonio 1965, writ ref'd n.r.e.). Appellees claimed a share in their cotenant's improvement without paying for its construction. Owelty is an inappropriate remedy because the overwhelming weight and preponderance of the evidence supports the finding the salt is of uniform value throughout the partitioned estate. There is no evidence that the minerals comprising the cavern walls have more or better minerals than the rest of the estate. There is no evidence beyond the existence of the cavern to support enhanced value of the portion allotted to Speer. Appellees' state in their brief the cavern is the most essential factor in the disparity in value between the tracts. Therefore, even if the cavern were an improvement to the mineral estate

as asserted by appellees, M.U.S.T. created the cavern and is entitled to its improvement without regard to the enhancement of the value of the estate partitioned to it caused solely by the presence of that improvement.

### In Personam Judgment Against Mapco, Inc.

Owelty is properly awarded between cotenants to effectuate an equitable partition of their property. *Sayers v. Pyland,* 139 Tex. 57, 161 S.W.2d 769 (1942); *Bouquet v. Belk,* 376 S.W.2d 361 (Tex.Civ.App.—San Antonio 1964, no writ). Appellees produced no evidence at trial that Mapco, Inc. was an owner of the property, nor did they produce evidence showing M.U.S.T. was an alter ego of Mapco, Inc. We can find no pleadings where appellees made Mapco, Inc. a party defendant, no allegations of agency or alter ego between Mapco, Inc. and M.U.S.T., no allegations Mapco, Inc. is or was an owner of an interest in the mineral estate. There is insufficient evidence to support the trial court's findings that M.U.S.T. is the alter ego of Mapco, Inc. and that Mapco, Inc. is the equitable owner of M.U.S.T.'s interest in the mineral estate.

For the reasons noted, I respectfully dissent.