

# NUMBER 13-20-00172-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

MYERS-WOODWARD, LLC,                                                          Appellant,

v.

UNDERGROUND SERVICES
MARKHAM, LLC, AND
UNITED BRINE PIPELINE
COMPANY, LLC,                                                               Appellees.

### On appeal from the 130th District Court
### of Matagorda County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Tijerina**
**Memorandum Opinion by Justice Tijerina**

Appellant and cross-appellee Myers-Woodward, LLC (Myers) challenges the trial

court's judgment requiring that appellees and cross-appellants Underground Services

Markham, LLC, and United Brine Pipeline Company, LLC (collectively, the Company) pay

Myers $258,850.41 in past royalties. By four issues, that we have reorganized and renumbered, Myers contends that: (1) the trial court improperly determined that the correct royalty measure is market value rather than proceeds; (2) the trial court incorrectly calculated the amount of damages even under a market value royalty measure; (3) the trial court erred by directing a verdict for the Company on Myers's breach of implied marketing covenant claim; and (4) the trial court erred by concluding that the Company owns certain subsurface caverns. In its cross-appeal, the Company contends by two issues that: (1) the trial court erred by restricting the Company's right to store materials in its salt caverns; and (2) the damages awarded should be modified to match the amount reflected in the trial court's findings of fact. We reverse and remand in part, reverse and render in part, and affirm in part.

## I.  PERTINENT FACTS

Robert and Kathryn Myers, James and Cherie Myers, David Woodward, and Ricky Woodward owned the surface estate and a 1/8 non-participating royalty interest in, among other minerals, salt on 160 acres of property near Clemville, Texas in Matagorda County.[1] The Myerses and the Woodwards transferred all their interests in the property to Myers in 2013. The Company owns the executive mineral interest in the salt under the property.

## A.  The Company Sues Myers

On April 15, 2013, the Company sued Myers seeking a declaratory judgment, stating specifically in its petition the following:

---

[1] "A non-participating royalty interest is a royalty interest that does not include the right to lease the mineral estate, receive delay rentals, or bonus payments." *BlueStone Nat. Res. II, LLC v. Nettye Engler Energy, LP*, 640 S.W.3d 237, 242 (Tex. App.—Fort Worth 2020) (citing *Hysaw v. Dawkins*, 483 S.W.3d 1, 9 (Tex. 2016)) *aff'd*, 639 S.W.3d 682 (Tex. 2022).

[the Company] desires to commence the drilling of one or more wells on the Subject Tract to produce salt and salt brine from under the Subject Tract, and has contacted the Royalty Owners [, including Myers] to attempt to reach an agreement as to the proper remittance methodology for [The Company] to use to discharge its royalty obligation to the Royalty Owners [, including Myers,] on produced salt brine. [The Company] has failed to reach an agreement and a justiciable controversy exists as [to] the proper methodology for [The Company] to use to discharge its royalty obligation to the Royalty Owners [, including Myers] on produced salt brine, which currently affects the feasibility of drilling any wells on the Subject Tract.

The Company also alleged:

Due to the claims of the Surface Owners and potential claims by the Royalty Owners, there exists a justiciable controversy as to whether cavern space created by [the Company] in the salt mass underlying the Subject Tract through brine mining and the right to store oil, gas and other gases or liquids in such cavern space is owned by [the Company], as the creator of the cavern space and the owner of the salt and salt formations, or the Surface Owners of the Subject Tract, and whether Royalty Owners have any royalty or other rights in and to any substances (not produced or originating from the Subject Tract or lands pooled therewith) stored in any caverns created in the salt mass or revenues derived therefrom.

The Company sought declarations that: (1) "its royalty obligations . . . are discharged and satisfied by tendering to the owners of the reserved interests at the well or into the pipeline to which the well is connected 1/8th of the salt brine produced in its natural state in which it is produced at the well"; and (2)

[the Company] . . . owns . . . the exclusive and sole right to store oil, gas and other gases or liquids in cavern space created by [the Company] through brine production from the salt mass under the Subject Property, and that Royalty Owners[, including Myers,] have no rights in and to any substances (not produced or originating from the Subject Tract or lands pooled therewith) stored in any caverns created in the salt mass or revenues derived therefrom.

## B.    Myers Files a Countersuit

After filing its suit, the Company then mined salt on the property from 2015 to

3

August 2019 without paying royalties to Myers. Myers then filed a countersuit stating the following:

> Myers Defendants, as owners of the Subject Tract, are entitled to recover for damages to the surface and subsurface of the Subject Tract caused by operations conducted by [the Company] on adjoining or nearby lands. On information and belief, [the Company has] caused such damages to the Subject Tract and to the Myers Defendants' economic interests therein. [The Company is] liable for such damages under theories of negligence, gross negligence, strict liability, and/or intentional or willful misconduct, including, but not limited to, failing to construct storage caverns having mechanical integrity, allowing noxious, hazardous, flammable or explosive substances to escape from storage caverns and/or surface facilities, failing to provide sufficient lateral and subjacent support, trespassing, creating or allowing one or more nuisances, creating conditions which make the use of the Subject Tract dangerous or more expensive, rendering impractical or uneconomic the mining or production of minerals from the Subject Tract, and polluting or contaminating the surface and/or subsurface of the Subject Tract. On information and belief, the conduct of [the Company] was such as to justify the imposition of punitive or exemplary damages. Myers Defendants sue for all economic and other damages, and for punitive or exemplary damages as applicable.

In a supplemental original counter petition, Myers argued that the Company "owns only the salt" and that Myers owns "the fee simple absolute (including all geologic structures in the subsurface) in the Myers Land and a 1/8 royalty on all minerals, including salt, produced or mined therefrom." In addition, Myers "strongly" opposed the Company's "claims to have the right to use the Myers Land for storage of hydrocarbons or other products." Myers sought a declaratory judgment that the Company did not "have the right to use the Myers Land for any purpose other than mining for and removal of salt, and specifically that [the Company did] not have the right to use the Myers Land for storage of hydrocarbons or other products or substances."

4

## C.    Competing Motions for Summary Judgment

The parties filed competing motions for summary judgment. The trial court granted in part and denied in part the Company's second amended motion for partial summary judgment; it denied Myers's motion for partial summary judgment in its entirety. Specifically, the trial court declared, in relevant part, that the Company "is the owner of the subsurface caverns created by its salt mining activities on the Subject Tract."

Myers filed a third amended counterclaim seeking declarations that (1) "under the 1947 deed, [the Company] has the right to use the Myers Land only for the purpose of mining, drilling, and operating for salt, and the maintenance of facilities and means necessary or convenient for producing, treating and transporting salt, and housing and boarding its employees engaged in such activities"; (2) the Company's "royalty obligation to [Myers] . . . under the 1947 Mineral Deed is not discharged by tendering to [Myers] at the well or into the pipeline to which the well is connected 1/8th of the salt 'in kind'"; (3) the Company must "diligently market [Myers's] royalty share of any salt produced"; (4) Myers's "1/8 royalty on any salt produced is payable in money, or alternatively, at their election, in kind"; and (5) Myers is "entitled to 1/8 of the proceeds of sale of the salt at the wells, free of production costs." Myers further sought damages for the Company's alleged breach of the covenant of utmost good faith and fair dealing, breach of the covenant of reasonable development, breach of the covenant to diligently market, conversion, and civil theft.

## D.    The Trial Court's Rulings

The parties filed additional competing motions for summary judgment. The trial

5

court denied the Company's motion for partial summary judgment to the extent it requested a declaration that the Company's "royalty obligations are satisfied by tendering [to Myers its] royalty share of produced salt into the pipeline to which the wells are connected." It also denied the Company's motion to the extent it requested a declaration that the Company "does not have the duty to market Myers's royalty share of produced salt." The trial court further denied Myers's motion for partial summary judgment, which requested a declaration that the Company "owed various specific duties to them under the 1947 Deed and Amendment that are the subject of the lawsuit." However, the trial court granted Myers's motion in part and clarified that the Company may only use the subsurface caverns for the purposes specified in the deed, which includes: the right to use the surface and subsurface of the property for mining, drilling, and operating for salt, and for "the maintenance of facilities and means necessary or convenient for producing, treating, and transporting salt, and for housing and boarding its employees engaged in such activities."

The trial court denied Myers's motion for summary judgment on its conversion and civil theft claims. The trial court granted partial summary judgment to Myers and declared that under the deed, the Company owes Myers: a duty of utmost good faith and fair dealing in exercising or refraining from exercising its executive rights to the salt; a duty "to refrain from acts of self-dealing that unfairly diminish the value [of Myers's] 1/8 royalty interest in the salt"; a duty "to secure for [Myers] every benefit that [the Company] exacts for itself"; and a duty "to market [Myers's] 1/8 royalty share of the salt produced reasonably, prudently, in good faith and with due diligence." The trial court denied the

6

Company's motion for summary judgment to the extent it requested declarations that (1) its "royalty obligations are satisfied by tendering [Myers's] royalty share of produced salt into the pipeline to which the wells are connected" and (2) it "does not have the duty to market [Myers's] royalty share of produced sal[t]."

Prior to a bench trial, the trial court held as a matter of law that the proper measure of royalties is: "one-eighth royalty based on the market value of the salt at the point of production."[2] The trial court held a bench trial and applied this formula to determine the amount the Company owed Myers in royalties and to address the merits of Myers's remaining live claims. Applying the aforesaid formula, the trial court found that the Company owed $258,850.41 to Myers for its 1/8 royalty interest for the years 2015 through August 31, 2019. The trial court entered a take-nothing judgment on Myers's other claims. The parties filed this appeal and cross-appeal.

## II. THE DEED

By its first issue, Myers contends the trial court improperly determined that its royalty should be calculated at the wellhead, meaning that post-production costs are deducted from the royalty payments. The Company disagrees, arguing that the trial court's royalty determination is correct.[3]

---

[2] The trial court explained that it had determined the amount owed based on "the fair market value of the salt at the wellhead."

[3] The Company further argues that Myers's appellate argument "is contrary to the position that it consistently—and successfully—advocated below." Thus, according to the Company, Myers waived its appellate argument. However, as further explained below, the trial court did not err by concluding that the royalties should be calculated at the well. Thus, we need not address this argument as it is not dispositive. See TEX. R. APP. P. 47.1.

7

**A.      Standard of Review**

"Deeds are interpreted and construed as contracts." *Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC*, 639 S.W.3d 682, 689 (Tex. 2022). Thus, the standard rules of contract construction apply to our analysis of the meaning of a deed. *Id.* "Our objective is to 'ascertain the true intentions of the parties as expressed in the writing itself,' beginning with the instrument's express language." *Id.* "[W]e consider the entire writing and attempt to harmonize the provisions[,] so all are given effect and none are rendered meaningless." *Id.* at 690. We afford the document's language "its plain, grammatical, and ordinary meaning unless doing so 'would clearly defeat the parties' intentions' or the instrument shows the parties used the terms in a different or technical sense." *Id.* Upon our de novo review of the instrument at issue, we must not interpret its language "to impose a special limitation unless the language is so clear, precise, and unequivocal that we can reasonably give it no other meaning." *Tana Oil & Gas Corp. v. Cernosek*, 188 S.W.3d 354, 360 (Tex. App.—Austin 2006, pet. denied).

**B.      Applicable Law**

"In general, oil and gas royalty interests are free of production expenses but [are] 'usually subject to post-production costs.'"[4] *Burlington Res. Oil & Gas Co. LP v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 203 (Tex. 2019); *Chesapeake Expl., LLC v. Hyder*, 483 S.W.3d 870, 872 (Tex. 2016) (op. on reh'g) (citing *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121–22 (Tex. 1996)); *BlueStone Nat. Res. II, LLC v. Nettye Engler*

---

[4] "Production means actual physical extraction of the mineral from the land." *Exxon Corp. v. Middleton*, 613 S.W.2d 240, 244 (Tex. 1981) (citing *Monsanto Co. v. Tyrrell*, 537 S.W.2d 135 (Tex. Civ. App.—Houston 1976, writ ref'd n. r. e.)).

*Energy, LP*, 640 S.W.3d 237, 242 (Tex. App.—Fort Worth 2020), *aff'd*, 639 S.W.3d at 685, 696. Post-production costs generally include "'processing, compression, transportation, and other costs expended to prepare raw oil or gas for sale at a downstream location.'" *Burlington Res. Oil & Gas Co. LP*, 573 S.W.3d at 203.

The payment of royalties is generally calculated "at the well" or "at the wellhead." *See Judice v. Mewbourne Oil Co.*, 939 S.W.2d 133, 135 (Tex. 1996). The phrases "at the wellhead" or "at the well" in a lease mean that the value of the mineral is calculated before it has been altered for sale and before other value is added in preparing and transporting it for the market. *Id.* (citing *Heritage Res.*, 939 S.W.2d at 126–27). "When a mineral lease requires royalty to be computed 'at the well,' the royalty interest bears its usual share of post-production costs." *BlueStone Nat. Res. II, LLC v. Randle*, 620 S.W.3d 380, 388–91 (Tex. 2021). "If the royalty is valued at the well but the sale takes place after the product has been processed and transported, the product sold is generally of greater value than the product in which the royalty holder has an interest." *Burlington Res. Oil & Gas Co. LP*, 573 S.W.3d at 203. A royalty valued at the well requires that the lessee adjust the sales price of the commodity to properly calculate the royalty payment. *Id.* at 203–04 (citing *Heritage Res.*, 939 S.W.2d at 122–23).

> If the sale giving rise to the royalty payment took place at an upstream point before the expenditure of postproduction costs, then the sales price would already reflect the lower value of the product at that stage of development, and there would be no costs to deduct. The sales price would already reflect the raw product's lower value.

*Id.* at 204 n.5.

9

"As in most situations, 'the parties may modify this general rule by agreement'" and "are free to contract for a royalty calculated based not on the value of the oil and gas at the well but on its value at the point of sale." *Burlington Res. Oil & Gas Co. LP*, 573 S.W.3d at 203–04 (citing *Heritage Res.*, 939 S.W.2d at 131 (Owen, J., concurring) "If [the parties] had intended that the royalty owners would receive royalty based on the market value at the point of delivery or sale, they could have said so."))); *BlueStone Nat. Res. II*, *LLC*, 620 S.W.3d at 388–91 (citing *Chesapeake Expl. LLC*, 483 S.W.3d at 872; *Heritage Res.*, 939 S.W.2d at 122).

> "'Proceeds' or 'amount realized' clauses require measurement of the royalty based on the amount the lessee in fact receives under its sales contract for the gas," regardless of whether it is more or less than market value. In common parlance, the "proceeds" of a sales transaction may be either the gross amount received or the net amount remaining after deductions. Whether a mineral lease requires one or the other depends on the contract language.

*BlueStone Nat. Res. II*, *LLC*, 620 S.W.3d at 389–90 (internal quotations omitted); *see Martin v. Glass*, 571 F.Supp. 1406, 1411–15 (N.D. Tex. 1983) (stating that the phrase "net proceeds" contemplates deductions); *see also* Byron C. Keeling, *In the New Era of Oil and Gas Royalty Accounting: Drafting A Royalty Clause That Actually Says What the Parties Intend It to Mean*, 69 BAYLOR L. REV. 516, 524 (2017) (explaining that leases that include a proceeds-based royalty clause requires for "the lessee [to] calculate its royalty payments at the 'point of sale' or at the 'point of delivery to a third party purchaser'"). "Market value" is defined as "the price a willing buyer under no compulsion to buy will pay to a willing seller under no compulsion to sell." *BlueStone Nat. Res. II, LLC*, 620 S.W.3d at 388.

However, if the instrument does not state whether royalties will be paid at the point of sale (i.e., that it is a proceeds-based royalty), the general rule applies, and the royalty is calculated at the wellhead allowing the lessee to deduct post-production costs. *See Burlington Res. Oil & Gas Co. LP,* 573 S.W.3d at 203; *Chesapeake Expl., LLC*, 483 S.W.3d at 872; *Heritage Res.,* 939 S.W.2d at 122; *BlueStone Nat. Res. II, LLC*, 640 S.W.3d at 242; 69 BAYLOR L. REV. at 530–31 ("[E]ven in the absence of any 'at the well' language . . . courts routinely concluded that . . . unless the parties' lease expressly required the lessee to calculate its royalty payments at a location other than the wellhead, the lessee could properly calculate its royalty payments on the basis of the value or price of its production at the wellhead.").

## C.  Analysis

The parties' dispute centers on how the royalty payments should be calculated. The royalty clause at issue states that Myers is entitled to a "royalty of 1/8 of all the gas or other minerals in, on, or under, or that may be produced from [Myers's property]." Myers claims that it owns the salt in-kind and that because it chose to be paid a monetary royalty, the net proceeds/amount realized method applies.

### 1.  The Parties did not Contract for the Amount Realized

We disagree. The Texas Supreme Court rejected a similar argument. Stating that "[i]f the parties intended royalties to be calculated on the amount realized standard, they could and should have used only a 'proceeds-type' clause.'"[5] *Exxon Corp. v. Middleton*,

---

[5] In *Exxon Corp. v. Middleton*, the lease stated that the lessee would "pay one-eighth of the market value at the well of all gas sold or used off the premises." 613 S.W.2d 240, 245 (Tex. 1981). The court explained that "[t]he parties did not use 'market value' and 'amount realized' interchangeably," and it rejected the lessee's "assertion that the parties intended 'market value' to have essentially the same

613 S.W.2d 240, 245 (Tex. 1981). In that case, the lease included both at the well and "proceeds/amount realized" language. *Id.* The *Middleton* court concluded that, because the parties had not limited the royalty language to the proceeds based/amount realized method and had included at the well language, the parties intended to calculate royalties at the wellhead. *Id.* Here, the deed does not have a clause stating that royalties will be measured on the proceeds-based/amount realized method. If the parties intended such a calculation, they could have and should have so contracted. *See id.* Thus, we conclude that the proceeds based/amount realized method does not apply in this case. *See id.*

## 2. The General Rule Applies

As previously stated, the general rule that royalties are measured at the wellhead applies unless the contract states otherwise. *Burlington Res. Oil & Gas Co. LP*, 573 S.W.3d at 203; *Chesapeake Expl.*, LLC, 483 S.W.3d at 872; *Heritage Res., Inc.*, 939 S.W.2d at 122; *BlueStone Nat. Res. II, LLC*, 640 S.W.3d at 242; 69 BAYLOR L. REV. at 530–31. And here, the deed is silent regarding whether royalties will be calculated at the wellhead or will be calculated utilizing the proceeds-based/amount realized method. Accordingly, we must apply the general rule that royalties are measured at the wellhead. *Burlington Res. Oil & Gas Co. LP*, 573 S.W.3d at 203; *Chesapeake Expl.*, 483 S.W.3d at 872; *Heritage Res., Inc.*, 939 S.W.2d at 122; *BlueStone Nat. Res. II, LLC*, 640 S.W.3d at 242. If the parties had contemplated otherwise, they would have said so in the deed.[6]

---

meaning as 'amount realized.'" *Id.*

[6] We note that proceeds-based royalty clauses "became more common as lessors enjoyed greater bargaining power during the period of rising oil prices in the early 2000s, [and] may specify that the lessee should calculate its royalty payments at the 'point of sale' or at the 'point of delivery to a third[-]party purchaser.'" Byron C. Keeling, *In the New Era of Oil and Gas Royalty Accounting: Drafting A Royalty Clause That Actually Says What the Parties Intend It to Mean*, 69 BAYLOR L. REV. 516, 524 (2017). However, the

### 3. There is No "in-kind" Royalty Clause

Additionally, Myers claims it owns an in-kind 1/8 share of the salt produced from the property, and therefore, a proceeds-based royalty payment is due even though the deed contains no such language.

> Under an "in-kind" royalty clause, the lessor is entitled to receive a proportional share of the oil or gas that the lessee produces from the lease. Generally, an "in-kind" royalty clause will provide that the lessee may deliver the lessor's royalty oil—the lessor's proportional share of the lessee's production—either to the lessor's physical possession or to the lessor's credit in a pipeline or other oil storage facility.
>
> . . . .
>
> Some leases contain "hybrid" royalty clauses that require monetary royalties under some circumstances and in[-]kind royalties under other circumstances. For instance, some leases may give the lessor the right to decide, at its discretion, to receive in kind royalties instead of monetary royalties. In that situation, the rules that will govern the lessee's payment obligations will depend on whether the lessor elects to receive in kind royalties or monetary royalties.

Byron C. Keeling & Karolyn King Gillespie, *The First Marketable Product Doctrine: Just What Is the "Product"?*, 37 St. Mary's L.J. 1, 13 n.46, 17 (2005).

If Myers wished to receive royalties on the basis of the enhanced value of the salt production at a downstream location, Myers was required to negotiate language in its lease "expressly requiring their lessees to pay royalties on the price that those lessees actually receive on selling the [salt] at a downstream location—at a minimum, by eliminating any 'at the wellhead' language in the royalty clause *and* by *disclaiming* the default rule for calculating royalties in historical rule states."[7] *See* 69 Baylor L. Rev. at

---

deed at issue here was drafted in 1947.

[7] We note that the deed contains no "at the wellhead" clauses. However, as previously explained,

563 (emphasis added). Myers cites cases and authority merely supporting a conclusion that a lease for minerals may include a clause giving the royalty owner the option to take his royalty in kind.[8] However, the deed here does not contain an "in-kind" royalty clause

---

the general rule that royalties are usually calculated at the wellhead applies unless otherwise stated. *Burlington Res. Oil & Gas Co. LP v. Tex. Crude Energy,* 573 S.W.3d 198, 203 (Tex. 2019); *Chesapeake Expl. v. Hyder*, 483 S.W.3d 870, 872 (Tex. 2016) (op. on reh'g); *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 122 (Tex. 1996); *BlueStone Nat. Res. II, LLC v. Nettye Engler Energy, LP*, 640 S.W.3d 237, 242 (Tex. App.—Fort Worth 2020), *aff'd*, *Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC* 639 S.W.3d 682, 696 (Tex. 2022); 69 BAYLOR L. REV. at 530–31.

[8] For example, Myers cites Keeling's article, which states the following:

> Under most of these leases, the oil royalty clause, unlike the gas royalty clause, *contains "in kind" royalty language* that gives the lessor the right to receive an actual royalty share of the lessee's oil production. An *"in kind" royalty provision* essentially gives the lessor the option to receive its oil royalties in the form of the oil itself, rather than a monetary payment.

> But, while many leases continue to include oil royalty clauses with "in kind" royalty language, "in kind" royalty language is a relic of a past era. "As a practical matter, most royalty owners lack the resources to receive delivery of oil in kind." If the lessor has no means to receive and sell its royalty share of the oil production, then any "in kind" royalty language is largely unnecessary, and both the lessor and the lessee should consider removing it from their lease. Under *"in kind" royalty language*, the lessor effectively owns title to its royalty share of the oil production. A lessor who has no means to receive any oil, however, likely does not want to bear any environmental responsibility for its royalty share of the oil. And if the lessor cannot take physical possession of its royalty share of the oil, the lessee likely does not want the potential tort liability, in conversion or negligence, for having to handle and sell the lessor's share of the oil. If the lessor and lessee agree to remove any "in kind" royalty language from their lease, "the oil royalty clause will be very similar to the gas royalty clause."

> If, for whatever reason, the parties wish to include "in kind" royalty language in their lease, they may want to draft the language to confirm that it applies only when the lessor actually takes physical possession of the royalty oil.

69 BAYLOR L. REV. 516, 573 n.233 (2017) (internal citations omitted) (emphasis added). However, this passage does not support Myers's argument that it has an in-kind royalty option. Instead, this passage supports our conclusion that to convey an in-kind royalty, the instrument must contain "in-kind royalty language." *See id.*

In addition, in its brief, Myers cites: Laura H. Burney, *The "Post-Production Costs" Issue in Texas and Louisiana: Implications for the Fate of Implied Covenants and Pro-Lessor Clauses in the Shale Era Oil and Gas Lease*, 48 ST. MARY'S L.J. 599, 627 n.162 (2017) ("Historically, lease forms typically provide an *option* for the lessor to *take his share of the oil royalty 'in kind'*; however, that option is rarely exercised . . . . Instead, the producer sells the oil and pays the lessor the fractional share of the proceeds from the sale as required in the lease.") (emphasis added).

This authority supports a conclusion that when the parties contemplate an in-kind royalty, the lease

or any language indicating that Myers can opt to take its share of the production in-kind. Moreover, the authority cited by Myers does not support a conclusion that because a contract contains an in-kind royalty clause, the royalty owner may receive payment based on a proceeds-based/amount realized royalty. Thus, we find no merit in this argument. Accordingly, we overrule Myers's first issue.[9]

### III.    MARKET VALUE COMPUTATION

By its second issue, Myers contends that the trial court relied on evidence of "'comparable sales' reflected in fixed price royalty clauses that [the Company] has negotiated with other royalty owners under salt leases," and "[r]oyalty clauses in salt leases are not sales of salt—much less 'comparable' sales." Specifically, Myers complains that the data utilized by the Company's experts, Dr. Scott Jones and Wayne Sneed, was unreliable and that the experts falsely assumed that "fixed price royalty clauses are comparable sales of salt."[10] Thus, according to Myers, because the data is unreliable, the evidence "is legally insufficient to support the trial court's findings in support of its market value calculation."[11]

---

must contain language providing for this option. Here, the deed contains no such language.

[9] As a sub-issue to its first issue, Myers contends that the trial court improperly excluded its proffered exhibits, which it argues "are relevant to the net proceeds that [the Company] received on the sale of its salt production from the Myers property." Myers bases this sub-issue on its insistence that the net proceeds/amount realized method applies to its royalties. However, since we have concluded that the net proceeds/amount realized method is not applicable, we overrule Myers's sub-issue to its first issue.

[10] Myers presents its second issue as an alternative to its first issue. Thus, by its second issue, Myers assumes that the market value of the salt is determined at the wellhead.

[11] Myers states in its brief that the evidence is factually insufficient. However, it does not explain this assertion with substantive argument. Therefore, we construe this argument as the same as its challenge to the legal sufficiency of the evidence on the basis that the Company's experts' data was unreliable.

15

Market value is usually determined by reviewing sales comparable in time, quality, and availability of marketing outlets. *Tex. Oil & Gas Corp. v. Vela*, 429 S.W.2d 866 (Tex. 1968). "This is usually established by opinions from expert witnesses who have evaluated [mineral] sales in a given field and arrived at a price which they consider to . . . represent fair market value at a given time." *Amoco Prod. Co. v. First Baptist Church of Pyote*, 579 S.W.2d 280, 287 (Tex. App.—El Paso 1979, writ ref'd n.r.e.).

"[M]arket value . . . may be established by expert testimony," and "[o]nce experts qualify, their testimony is to be considered by the fact finder." *Middleton*, 613 S.W.2d at 249. Furthermore, "[o]bjections to the basis of their testimony goes to its weight, not to its admissibility." *Id.* (citing *Weymouth v. Colorado Interstate Gas Co.*, 367 F.2d 84 (5th Cir. 1966)). The *Middleton* court agreed that attempts to confine experts' testimony to sales of exact comparability should be rejected, reasoning:

> This view is too restrictive for the situation of an expert witness explaining his opinion. [Our acceptance of the l]essors' [argument] would bind upon us and all experts the rules applicable to introduction of direct evidence of comparable sales. This is simply unrealistic where we deal with an expert who, once he establishes his qualifications and he gives his broad, general opinion, needs to be able to reveal the basis for his opinion in his own language without too many communication-crippling legal barriers thrown in his way.

*Id.* The *Middleton* court then pointed out that it was sufficient that the experts testified that the prices they used were fairly comparable and that the trial "court held that objections against [i]ncomparable sales went only to the weight which the fact finder should attach to the experts' opinion." *Id.*

16

Myers's contention that Sneed and Jones used unreliable data to determine the market value of the salt is not supported by any pertinent authority.[12] Myers cites no authority, and we find none, supporting a conclusion that the data utilized by the Company's experts was unreliable. In addition, Jones and Sneed were qualified to testify, and each testified that he relied on comparable sales of salt to determine its market value at the wellhead. Accordingly, because we are not persuaded by Myers's unsupported argument, and the trial court heard evidence from two experts regarding the market value of salt at the wellhead, we are unable to conclude that the evidence is legally or factually insufficient based on Myers's argument that the data was unreliable.[13] We overrule Myers's second issue.

## IV. EXCLUSION OF EXPERT TESTIMONY

By a sub-issue to its second issue, Myers contends that the trial court improperly excluded testimony from its expert witness, Shane Johnson. Specifically, Myers argues that the trial court improperly determined that Dr. Johnson was unqualified to testify regarding the market value of salt.[14]

---

[12] Although Myers couches its argument as a challenge to the legal and factual sufficiency of the evidence, the substance of Myers's argument is that Sneed's and Jones's testimony was unreliable under *Daubert*. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). However, in its brief, Myers does not include any analysis of the reliability of Sneed's and Jones's testimony under *Daubert*. *See id.* Accordingly, the issue of whether the evidence was admissible under *Daubert* is not properly before us.

[13] Myers's challenge to the legal and factual sufficiency of the evidence is premised on a finding that the data is unreliable. Thus, we limit our analysis to this argument.

[14] Myers further argues that the trial court improperly excluded Johnson's testimony as unreliable because he used a netback method, rather than a comparable method, of calculating the value of the salt. Because we conclude that the trial court did not abuse its discretion by excluding Johnson's testimony on the basis that he was not qualified, we need not address this argument. *See* TEX. R. APP. P. 47.1.

17

We afford the trial court broad discretion in deciding whether to admit or exclude expert testimony. *Cura-Cruz v. CenterPoint Energy Hous. Elec., LLC*, 522 S.W.3d 565, 572 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 719–20 (Tex. 1998); *Weingarten Realty Inv'rs v. Harris Cnty. Appraisal Dist.*, 93 S.W.3d 280, 283 (Tex. App.—Houston [14th Dist.] 2002, no pet.)). "We will reverse the trial court's ruling only if the court acted arbitrarily, unreasonably, or without reference to any guiding rules or principles." *Id.* (citing *Larson v. Downing*, 197 S.W.3d 303, 304–05 (Tex. 2006)).

The offering party bears the burden to show that the witness possesses "special knowledge as to the very matter on which he proposes to give an opinion." *Id.* "General experience in a specialized field does not qualify a witness as an expert." *Id.* (citing *Houghton v. Port Terminal R.R. Ass'n*, 999 S.W.2d 39, 47–48 (Tex. App.—Houston [14th Dist.] 1999, no pet.)). The offering party must show that the expert is qualified to give an opinion on the particular subject before the trial court because the expert has knowledge, skill, experience, training, or education about that specific issue before the court. *Id.*

> There are no definitive guidelines to determine whether a witness's education, experience, skill, or training qualifies the witness as an expert. The witness may express an opinion on a subject if the witness has specialized knowledge that will assist the trier of fact in understanding the evidence or in determining a fact in issue. The specialized knowledge which qualifies a witness to give an expert opinion may be derived from specialized education, practical experience, a study of technical works, or a varying combination of these things.

*Id.*; *see* TEX. R. EVID. 702.

Dr. Johnson testified that he is an expert on valuation. However, it is undisputed that Johnson has no experience in determining the value of any minerals, including salt.

18

Johnson's qualifications and competence must match the subject matter of the issue before the trial court, which was the value of the salt at the wellhead. *See id.* Thus, the trial court could have reasonably determined that Johnson did not have specific knowledge as to the very matter on which he proposed to give an opinion. Accordingly, we cannot conclude that the trial court acted without reference to any guiding rules or principles by finding that Johnson is not qualified to testify about the value of salt at the wellhead. *See id.* We overrule Myers's sub-issue to its second issue.

## V. BREACH OF IMPLIED MARKETING COVENANT

By its third issue, Myers contends that the trial court erred in directing a verdict against it on its claim for breach of the implied marketing covenant. Myers acknowledges that this covenant does not apply when royalty payments are based on market value. *See Yzaguirre v. KCS Res., Inc.*, 53 S.W.3d 368, 374 (Tex. 2001) (explaining that when the parties enter into a lease requiring a market-value royalty, the lessor does not need the protection of an implied covenant). Because we have determined that the royalty payments here are based on market value, we overrule Myers's third issue.

## VI. OWNER OF THE SUBSURFACE CAVERNS

By its fourth issue, Myers contends that the trial court erred in holding that the Company owns the subsurface caverns. Specifically, Myers argues that as the surface owner, it owns all the physical land, which includes surface, subsurface, the matrix of the underlying earth, and the reservoir storage space beneath the surface. The Company replies that the deed "conveyed [to the Company] an interest in real property: a fee simple of every type of mineral in, on, or under the land," which includes the entire mineral estate,

19

with no restrictions. In the alternative, the Company argues that Myers waived its challenge to its ownership of the subsurface caverns.

## A.    Waiver

The Company claims that Myers waived its appellate argument that the Company does not own the subsurface caverns. *See* TEX. R. CIV. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal."). We disagree.

In the trial court, the Company argued the following in its motion for partial summary judgment: "The cavern that will result from [the Company's] mining operations will be created entirely out of the salt formation that [the Company] owns. Unlike naturally existing pore space, [the Company] must maintain the artificially-created cavern in order for it to be utilized for storage purposes." The Company cited *Mapco, Inc. v. Carter*, stating: "the Beaumont Court of Appeals held that the owner of the fee interest in the salt retains a property interest in the cavern created by its mining activities." 808 S.W.2d 262, 276 (Tex. App.—Beaumont 1991) ("The underground storage cavern was formed out of the underground mineral salt, being the mineral estate," thus, "[a]ppellees own all rights and appurtenances to their mineral estate.") *rev'd in part on other grounds* 817 S.W.2d 686 (Tex. 1991).

Myers responded by arguing that as the owner of the surface estate, it owned the subsurface estate and that the Company could not claim ownership of the subsurface caverns as a mineral owner. Myers stated:

> The grant of the mineral estate in the [deed] expressly granted "the right of
> ingress and egress and possession at all times for the purpose of mining,

drilling and operating for said minerals and the maintenance of facilities and means necessary or convenient for producing, treating and transporting such minerals." Those are the sole purposes for which the Grantee or its successors could use the Myers Land. There is nothing—not a sentence, phrase or word in the [deed] which could be interpreted as granting the [Company] the right to use the Myers Land for storage.

Therefore, we conclude it did not waive its appellate argument.

## B.   Standard of Review

The trial court's granting of a traditional motion for summary judgment is reviewed de novo. *Franks v. Roades*, 310 S.W.3d 615, 620 (Tex. App.—Corpus Christi–Edinburg 2010, no pet.) (first citing *Provident Life & Accident Ins. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003); then citing *Branton v. Wood*, 100 S.W.3d 645, 646 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.)). "We must determine whether the movant met its burden to establish that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law." *Id.* (citing TEX. R. CIV. P. 166a(c)). We resolve all doubts about the existence of a genuine issue of material fact against the movant, and the movant bears the burden of proof. *Id.* at 620–21. "We take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor." *Id.*

## C.   Ownership

The surface overlying a leased mineral estate is the surface owner's property, and those ownership rights include the geological structures beneath the surface. *Humble Oil & Refining Co. v. West*, 508 S.W.2d 812, 815 (Tex. 1974). The surface owner, not the mineral owner, "owns all non-mineral 'molecules' of the land, i.e., the mass that undergirds the surface" estate. *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 630 F.3d 431, 442 (5th Cir. 2011). The conveyance of mineral right ownership does not convey the entirety of the subsurface. *Id.* Although the surface owner retains ownership and control of the subsurface materials, a mineral

21

lessee owns a property interest—a determinable fee—in the oil and gas in place in the subsurface materials. *Brown v. Humble Oil & Ref. Co.*, 126 Tex. 296, 83 S.W.2d 935, 940 (1935).

*XTO Energy Inc. v. Goodwin*, 584 S.W.3d 481, 487 (Tex. App.—Tyler 2017, pet. denied).

Most authority in Texas, as conceded by the Company, requires a conclusion that the surface estate owner owns the subsurface. *See id.* Nonetheless, the trial court, relying on *Mapco*, determined that the Company owns the subsurface caverns. *See* 808 S.W.2d at 278. Without citation to any authority, the *Mapco* court stated, "under well-recognized, decisional law, the continued ownership interest in the mineral estate in an underground storage facility is acknowledged and harmonious with the decisional law of our state." *Id.* However, the well-recognized, decisional law states that the mineral estate owner owns the minerals but not the subsurface. *XTO Energy Inc.*, 584 S.W.3d at 487. Therefore, we decline to follow *Mapco* in this case.

The Company merely owns the mineral estate, which includes ownership of the salt found in the subsurface materials. *See id.* Although a mineral owner may have a real property interest in the minerals in place, it does not "own" any specific minerals while they are still in the ground. *Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 15 (Tex. 2008). Rather, "[t]he minerals owner is entitled, not to the molecules actually residing below the surface, but to 'a fair chance to recover the oil and gas in or under his land, *or* their equivalents in kind.'" *Id.* (quoting *Gulf Land Co. v. Atlantic Ref'g Co*., 131 S.W.2d 73, 80 (1939)). The mineral estate owner is entitled to extract the minerals, lease to a producer the right to extract the minerals, receive royalty payments for minerals that are extracted, receive delay rentals, and receive any other compensation for the minerals.

22

*Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 49 (Tex. 2017). There is no case law that supports a conclusion that a mineral estate owner who does not own the surface estate owns the subsurface of the property and may then use the subsurface for its own monetary gain even after extracting all the minerals. *See XTO Energy Inc.*, 584 S.W.3d at 487. *Mapco* did not make this leap. *See* 808 S.W.2d at 278.

Accordingly, we conclude that as a matter of law, as the surface owner, Myers owns the subsurface of the property, including the caverns at issue here. As such, the trial court improperly granted the Company's motion for partial summary judgment on this ground.[15] We sustain Myers's fourth issue.

## VII.   USE OF SUBSURFACE CAVERNS

By its first cross-issue, the Company contends that the trial court erred by restricting its right to use the property for any other use besides "mining, drilling, and operating for salt and the maintenance of facilities and means necessary or convenient for producing, treating, and transporting salt, and for housing and boarding its employees engaged in such activities." This ruling disallows the Company from using the subsurface caverns to store hydrocarbons.[16] The Company's argument is premised on the Company owning the caverns. However, as we have already determined, the Company merely

---

[15] The trial court incorporated its partial summary judgment into its final judgment that forms the basis of this appeal.

[16] According to Myers, the Company intends to rent the subsurface caverns to other companies to store hydrocarbons, even after the Company ceases producing salt from the property, without compensating Myers.

23

owns the mineral estate and does not own the subsurface, which belongs to Myers. Therefore, we overrule the Company's first cross-issue.[17]

### VIII. MODIFICATION OF JUDGMENT

By its second cross-issue, the Company contends that we should modify the damages awarded to Myers in the final judgment to conform to the amount stated in the findings of fact.

"Findings of fact and conclusions of law filed after a judgment are controlling if there is any conflict between them and the judgment." *Zorilla v. Wahid*, 83 S.W.3d 247, 254 (Tex. App.—Corpus Christi–Edinburg 2002, no pet.) (citing *City of Laredo v. R. Vela Exxon, Inc.*, 966 S.W.2d 673, 678 (Tex. App.—San Antonio 1998, writ denied)); *see also* TEX. R. CIV. P. 299a ("If there is a conflict between findings of fact recited in a judgment . . . and findings of fact made [in findings of fact and conclusions of law], the latter findings will control for appellate purposes."). "When the findings of fact do not support the judgment, the judgment should either be reformed to conform to the findings, or if appropriate, it should be reversed." *Pac. Empls. Ins. v. Brown*, 86 S.W.3d 353, 357 (Tex. App.—Texarkana 2002, no pet.).

Because the findings of fact control, we must either modify the judgment to conform with those findings of fact or remand to the trial court for further proceedings

---

[17] The Company points to language in the instrument conveying its predecessor's interest in the property, which states that the predecessor granted its interest in and to all of the salt and salt formations. However, the deed did not include this language. Thus, the Company's predecessor did not receive a conveyance of the salt formations, and it merely received a conveyance of the salt. Accordingly, to the extent that the Company relies on this instrument to support a claim that it owns the salt formations, we conclude that argument lacks merit. *See CenterPoint Energy Houst. Electric, L.L.P. v. Old TJC Co.*, 177 S.W.3d 425, 432 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("It is well established under Texas law that a party cannot convey to another a greater interest in a property than it possesses.").

24

when the interests of justice so require. *See id.*; *see also* TEX. R. APP. P. 43.2. Here, the final judgment does not conform to the findings of fact. The findings of fact state: "Applying the Implicit Price Deflator for subsequent years, the court concludes [Myers is] entitled to the following payment for the interest in subsequent years: $0.084/ton in 2016; $0.0857/ton in 2017; $0.0878/ton in 2018 and $0.09/ton in 2019." However, the final judgment states that for 2016, Myers should receive $0.08333/ton, for 2017, Myers should receive $0.09083/ton, for 2018, Myers should receive $0.09301/ton, and for 2019, Myers should receive $0.09636/ton. Accordingly, we sustain the Company's second cross-issue.

## IX. CONCLUSION

We reverse in part the judgment insofar as it states that the Company owns the subsurface estate and render a judgment that the subsurface estate belongs to Myers. We reverse the judgment as to the award of damages to Myers for the years 2016 through 2019 and remand for the trial court to correct the final judgment to reflect the damages as calculated in the findings of fact. We affirm the remainder of the judgment.

JAIME TIJERINA
Justice

Delivered and filed on the
16th day of June, 2022.

25